**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 10-cv-01614 |
| MORANDO BERRETTINI and RALPH J. PIRTLE, | ) ) ) | Judge Robert M. Dow, Jr. |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

In 2005 and 2006, Defendant Ralph J. Pirtle ("Pirtle") was assigned to due diligence teams considering whether his employer, Royal Philips ("Philips"), ought to acquire three medical services companies: Lifeline, Invacare, and Intermagnetics. Pirtle, as Director of Real Estate, was tasked with analyzing how real estate issues should factor into Philips' decisions. Pirtle shared information that he learned in the due diligence process with Defendant Morando Berrettini ("Berrettini"), President of Berco Realty ("Berco") and occasional contractor for Philips. Berrettini used the information that he obtained from Pirtle to make well-timed trades in Lifeline, Invacare, and Intermagnetics and turned a substantial profit when Philips acquired two of those companies.

The Securities and Exchange Commission ("SEC") alleges that Defendants' conduct amounts to insider trading: Pirtle, the SEC claims, misappropriated information from Philips and tipped Berrettini, who traded on the tips. In support of its claim that Berrettini's trades were more than educated guesses and that the information Pirtle shared with Berrettini was not a

proper part of his work for Philips, the SEC observes that (among other things) Berrettini paid Pirtle more than $200,000 between 2003 and 2007, Pirtle did not have permission to use Berrettini or Berco in conducting due diligence on Lifeline, Invacare, or Intermagnetics, and the extraordinary timing of Berrettini's trades in Lifeline, Invacare, and Intermagnetics.

Defendants have moved for summary judgment. They insist that Pirtle merely gave Berrettini information sufficient for him (and Berco) to research the areas of Boston, Cleveland, and Albany where Lifeline, Invacare, and Intermagnetics were located. In other words, Defendants argue that Pirtle was just doing his job as usual, which frequently involved relying on outside vendors. Berrettini then combined the general information Pirtle gave him to do legitimate research on submarkets of Boston, Cleveland, and Albany with public information about Philips' interest in acquiring medical services companies, and that gave him a "hunch" that Philips was likely to acquire Lifeline, Invacare, and Intermagnetics. As for Berrettini's payments to Pirtle, Defendants insist they were legitimate loans, which Pirtle began repaying on time, in 2008, when the notes came due.

For the reasons stated below, Defendants' motions for summary judgment [87, 90] are respectfully denied.

## I.      Background

There is no dispute about when Berrettini bought and sold stock in Lifeline, Invacare, and Intermagnetics; the size and frequency of payments from Berrettini to Pirtle; and that Pirtle gave Berrettini at least some information that he learned while conducting due diligence on the target companies. At this point, the core of the dispute between Defendants and the SEC is *why* Defendants acted as they did. For instance, the parties disagree whether Pirtle shared

information about the target companies with Berrettini because he was (legitimately) being used as an outside contractor to help Pirtle with his substantial workload, or if the "research projects" that Pirtle claims to have given Berrettini were simply a cover for Pirtle's tips about Philips' business plans. The parties disagree whether Berrettini was just smart and lucky enough to buy Lifeline, Invacare, and Intermagnetics when he did, or if it is impossible to imagine that he would (or could) have bought the stocks in question without taking advantage of confidential information from Pirtle. The parties disagree whether Berrettini's payments to Pirtle were legitimate loans or gifts/bribes intended to keep Philips' business and inside information flowing from Pirtle to Berrettini. The parties disagree whether Pirtle's incomplete responses to questions about Berrettini's trades in Lifeline stock by the National Association of Securities Dealers ("NASD") were just off-the-cuff statements, or implicit indications of Pirtle's awareness that he violated insider trading laws.[1]

---

[1] Pirtle has moved to strike [122] the SEC's Rule 56.1(b) Response and deem admitted all statements provided in his Rule 56.1(a) Statement. As indicated on the Court's web page, "[m]otions to strike all or portions of an opposing party's Local Rule 56.1 submission are disfavored. Under ordinary circumstances, if a party contends that its opponent has included inadmissible evidence, improper argument, or other objectionable material in a Rule 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief, not in a separate motion to strike." See www.ilnd.uscourts.gov/home/Judgeinfo/aspx. Moreover, as the Court has explained, it is well aware of what it may consider on summary judgment. See *Bone Care International, LLC v. Pentech Pharmaceuticals, Inc*, 2012 WL 1068506, at *1 (N.D. Ill. March 29, 2012). The Court is capable of disregarding unfounded assertions of fact in Defendants' statements or the SEC's denials. Any statements or responses that contain legal conclusions or argument or are not supported by evidence in the record will not be considered by the Court in ruling on Defendants' motions for summary judgment. See *Id.* In this case, Pirtle believes that the SEC's 56.1(b) Response is "riddled with impermissible argument, evasive responses, and entirely non-responsive statements." The Court is able to disregard traces of argument in the SEC's Response. As for Pirtle's assertion that the SEC's Response is evasive and non-responsive, the Court disagrees. The SEC's Response was generally to the point and provided many helpful and precise citations to the record. For example, Pirtle complains that the SEC improperly responded to Paragraph 16 of his Statement, which asserts that it was "known by everybody on the mergers and acquisitions team" that Pirtle went to outside vendors to get market information "that they utilized in whatever fashion they utilized it." The SEC disputes that, and its response provides citations to the record to explain why, including citations to descriptions of Philips' procedures for using outside vendors on due diligence projects, testimony from various individuals at Philips about whether Pirtle followed those procedures, and testimony from the person that Pirtle believes he told that he would use an outside vendor to assist with his due diligence assignments. Pirtle's motion is respectfully denied.

### A.     Pirtle's Due Diligence for Philips on Lifeline, Invacare, and Intermagnetics

On December 6, 2005, Pirtle was invited to be on the due diligence team for the potential acquisition of Lifeline, codename "Project Mindpeace."  Pirtle testified that he was tasked with providing the team with information about the real estate market for commercial office and warehouse space in specific areas of suburban Boston.  That, Pirtle believed, meant analyzing the strength of that real estate market, rental rates, and building values in general.  Within a few days of getting his due diligence assignment, Pirtle claims to have telephoned Berrettini to ask for assistance.  According to both Pirtle and Berrettini, Pirtle provided geographic parameters — "south suburban Boston submarket" — and asked for general information about "market lease rates and market values."  Berrettini testified that after the call from Pirtle he asked his son, Ezio Berrettini ("Ezio"), the Vice President of Berco, to search for the market information Pirtle had requested on behalf of Philips.  Ezio testified that

> To the best of my recollection, I was given an assignment to find both sale and lease comps in the Boston area.  I was given a range of square footage for both.  It was information that was required right away and it just had to be basic — a basic idea of the market, quick and dirty as I remember the phrase being [* * *].

In addition to the market research, Berrettini asked Ezio to research publically traded medical services companies in that same geographic area.  Ezio's research allegedly turned up two companies that fit the description, Lifeline and Boston Scientific.

The SEC points to different facts: Philips repeatedly told members of the due diligence team for Mindpeace/Lifeline, in writing, that information about potential acquisitions was confidential.  Indeed, Pirtle does not dispute that.  According to his own testimony, Pirtle understood that the geographic location of the target company was confidential information.  He understood that "[i]f you disclose the real estate location, then you could easily determine the

4

occupant of the location and the company's name."  The SEC further emphasizes that Pirtle

knew that the information he had about Lifeline could not be shared with anyone outside the due

diligence team, and even then only on a restricted basis.  For example, in the middle of

December 2005, Pirtle received an e-mail from Philips making the point:

> You are receiving this e-mail because you are (or may become involved in Project Mindpeace. The purpose of this e-mail is to remind you of your obligations with respect to confidentiality and insider trading.
>
> *  *  * In connection with your involvement in Project Mindpeace, you may receive (or have received) confidential and/or price sensitive information relating to this project (hereinafter referred to as "Confidential Information").
>
> All such Confidential Information may only be used in connection with Project Mindpeace.  It is essential that you treat all Confidential Information strictly confidential and do not disclose it to someone other, except for disclosures to other members of your team on a "need to know basis".  If you believe that it is necessary to add someone to the team or to disclose it someone other than another team member, you are required to seek the prior permission of one of the following persons:
>
> Paul Bromberg
> Edo Pfennings
> Maarten Kwik
> Arno van Hekesen
>
> If a person is added to the team, please inform the undersigned [Arno van Hekesen] thereof by e-mail and forward such person a copy of this email so that he or she is reminded of his obligations with respect to confidentiality and insider trading.

Pirtle did not get permission from Bromberg, Pfennings, Kwik, van Hekesen or anybody else to

share information with Berrettini or Berco for his work on Project Mindpeace.  The SEC's

position is that having used Berrettini/Berco on other projects — non-due diligence projects —

was not enough to authorize Pirtle's use of Berrettini/Berco on Project Mindpeace and,

especially given the confidentiality notices, that should have been obvious.

The parties repeat their stories in connection with Philips' interest in Invacare (Project Vita-I) and Intermagetics (Project J or Jumbo). Pirtle became part of the due diligence team for Invacare in January 2006. Soon after getting his assignment, Pirtle claims that he contacted Berrettini for assistance. Pirtle testified that he asked Berrettini to provide him with "rental rates and values within a certain geographical area west of Cleveland" (where Invacare is located). Berrettini then allegedly passed the assignment to his son, asking the same questions as before about the real estate market and medical services companies in that area. Pirtle became part of the due diligence team for Intermagnetics in April 2006. Soon after, Pirtle allegedly gave Berrettini a "research project" about a particular area in Albany, New York. Berrettini then passed his son the research questions from Pirtle and, as in the other cases, asked his son to research medical services companies in the area.

The SEC takes the same dim view of Defendants' conduct in relation to Invacare and Intermagnetics that it did in relation to Lifeline: the circumstantial evidence — especially the well-timed trades and the absence of specific authorization to give Berrettini/Berco information related to Philips' acquisition targets — is sufficient to allow a reasonable jury to conclude that the "research assignments" were, at best, a ruse.

### B.     Berrettini Trades in Lifeline, Invacare, and Intermagnetics

According to Defendants, Pirtle gave Berrettini a research project related to his assignment on Project Mindpeace/Lifeline sometime in the first or second week of December 2005. Between December 15, 2005 and January 18, 2006, Berrettini and two entities that he controlled (Northchase I Venture & Berco Jaxon) proceeded to buy more than 17,000 shares of

Lifeline stock for approximately $655,000. On January 19, 2006, Philips publically announced its acquisition of lifeline. The stock price went up almost 19%.

Defendants assert that Pirtle gave Berrettini a research project related to his due diligence assignment on Invacare in January 2006. On February 1, 2006, Berritini bought 2,000 shares of Invacare for $70,000. Philips ultimately decided not to acquire Invacare.

As to Intermagnetics, Defendants claim that Pirtle gave Berrettini a research project related to his due diligence assignment in April 2006. Between April 28, 2006 and May 1, 2006, Berrettini and the entities he controlled bought 16,000 shares of Intermagnetics for more than $300,000. Philips publically announced its acquisition of Intermagnetics on June 15, 2006. The stock price went up over 26%.

Defendants explain that Berrettini bought these stocks by connecting the dots between disparate bits of public information and the clues in the research assignments that Pirtle gave him about submarkets in Boston, Cleveland, and Albany. For instance, Berrettini explains that Pirtle wanted Berrettini to do research on sales data in addition to lease data, which Berrtettini claims was unusual. Also unusual was that Pirtle did not disclose the Philips division seeking the information. Pirtle wanted Berrettini to do the research quickly. As for public information, there had been a number of articles in 2005, in the Wall Street Journal and elsewhere, suggesting that Philips was interested in acquiring medical services companies. Add that to Ezio's research and Berrettini came up with "hunches" that Philips had targeted Lifeline, Invacare, and Intermagnetcis for acquisition. After discussing Lifeline with his partners in Northchase and Berco, Berrettini informed Pirtle that he planned to buy Lifeline shares. According to Defendants, Pirtle told Berrettini not to do anything based on the information that Pirtle had

provided, and that Pirtle did not know whether Lifeline was an acquisition target. The story is substantially the same with regard to Invacare and Intermagnetics.

The SEC argues that Defendants' "hunch" story is highly implausible. Berrettini admits that he is not a sophisticated investor and that he has very little experience in stock trading. Even so, he invested over more than million dollars on three medical services companies after doing a little research on Google and Yahoo! Finance. And he hit the jackpot; the largest stock purchase that he ever made (Lifeline) also turned out to be his most successful. The simpler explanation for Berrettini's near-miraculous success in picking three medical services companies that Philips was considering buying and two that it actually acquired is that Pirlte tipped him. And Pirtle was motivated to help Berrettini because Berrettini had been giving Pirtle tens of thousands of dollars, including two checks for $15,000 payable to a Las Vegas casino close to the time when Pirtle gave Berrettini the "research projects."

### C.     Berrettini's Payments to Pirtle

The parties agree that Berrettini sent money to Pirtle on the following schedule:

| DATE | AMOUNT |
|------|--------|
| August 22, 2003 | $25,000 |
| December 3, 2004 | $11,580 |
| December 17, 2004 | $7,220 |
| December 31, 2004 | $1,750 |
| January 4, 2005 | $3,800 |
| February 24, 2005 | $5,900 |

| | |
|---|---|
| March 10, 2005 | $15,000 |
| April 21, 2005 | $25,000 |
| April 25, 2005 | $10,000 |
| June 30, 2005 | $31,800 |
| July 15, 2005 | $5,000 |
| August 12, 2005 | $12,266.70 |
| August 26, 2005 | $1,729 |
| December 5, 2005 | $15,000 |
| February 1, 2006 | $15,000 |
| December 29, 2006 | $36,000 |
| January 24, 2007 | $15,000 |

That's more than $200,000 between 2003 and 2007. The parties do not agree why Berrettini sent Pirtle so much money.

Defendants' position is that these payments from Berrettini to Pirtle were legitimate loans, intended to be repaid, with interest, after five years. According to Defendants, in the summer of 2003, Berrettini offered to loan Pirtle approximately $200,000 in lieu of a home equity line of credit. Berrettini offered a good interest rate, significantly better than Pirtle could get elsewhere. Pirtle does not argue that he needed the loans because he was short on funds, but rather that he borrowed money from Berrettini because it made good economic sense. The loans were supposed to be a win-win for Pirtle and Berrettini: Pirtle would get a great rate and Berrettini would get a decent return on his money, better than a savings account at least. On top

of that, Defendants admit Berrettini wanted to keep Pirtle happy. Berrettini got significant business as a vendor for Philips and he wanted Pirtle to keep sending work his way.

Pirtle began repaying the loans in 2008, and has, by now, repaid all the (alleged) loans. Defendants also emphasize that the payments both pre- and post-date the alleged illicit tips, which they think means they cannot be viewed as part of a *quid pro quo*. Only two of the payments support the SEC's story — the payments on December 5, 2005 and February 1, 2006 — and focusing on those two transactions distorts Defendants' relationship.

The SEC, for its part, thinks that the payments were bribes. Berrettini wanted to keep getting Philips' business and paying Pirtle helped assure that would happen. The SEC also points out that Pirtle violated Philips' business policies by taking money on the side from one of Philips' vendors. Pirtle admits that Philips would have fired him had it known about the "loans." The SEC also emphasizes the timing of the December 2005 and February 2006 payments. From December 8 to December 11, Defendants were together at the Monte Carlo Resort & Casino in Las Vegas. The trip began only one day after Pirtle learned that Project Mindpeace was about Lifeline. The trip ended only three days before Berrettini began buying shares of Lifeline. While in Las Vegas, Berrettini gave Pirtle a check for $15,000, payable to the casino. On February 2, 2006, one day after Berrettini began buying shares of Invacare, Berrettini gave Pirtle another check for $15,000, payable to the same casino in Las Vegas. Pirtle only started repaying Berrettini after he knew he was under investigation by the SEC.

###    D.    NASD Investigation

In April 2006, the NASD contacted Philips as part of its investigation of suspicious trading in Lifeline. Philips attorneys then asked employees with information about the Lifeline

acquisition if they knew anybody on the list of individuals who traded Lifeline stock in the period before there was a public announcement about the acquisition. Berrettini was on the list, and Pirtle told the lawyers that he knew Berrettini and had contact with him during the relevant period. Philips' attorneys followed-up by e-mail with a few more questions:

1) What was the nature and history of the relationship?

2) Frequency of contact?

3) A synopsis of any contact which occurred between the period of October 3, 2005 through January 18, 2006?

4) A statement as to the circumstances under which any knowledge of the company's business activities may have been gained by Mr. Berretini.

5) Any other information that may be of assistance to the NASD.

Pirtle responded the next day:

1. Mr. Berrettini is a principal of Berco Realty. Berco has represented Philips for the past 5 years in a real estate brokerage and real estate consulting capacity. I have worked with him and others in Berco with regard to real estate related activities.

2. The frequency of contact is on a regular basis as a result of its representation of Philips in the areas related above.

3. There has been contact with Berco (i.e. Mr. Berrettini) within this period of time with regard to many matters related to real estate requirements, lease negotiations, property disposition, consulting, and property redevelopment.

4. Mr. Berrettini, as an agent of Philips, is familiar with the general, but not specific, activities of various product divisions and subsidiaries as a result of Berco doing work for most of Philips U.S. Divisions and business groups. Berco has done a significant amount of work related to our Medical Division. In this regard, Mr. Berrettini has had an opportunity to see both the growth and decline of various of our businesses.

5. Mr. Berrettini has been a valuable service provider to Philips and over the years has demonstrated high business intelligence, professionalism and standards.

The SEC points out that missing from these answers is any mention of the Berrettini's "loans" or the "research projects" that Pirtle supposedly gave Berrettini about Lifeline. As the SEC puts it, this was Pirtle's chance to "come clean." That he plainly did not do.

## II.     Legal Standards

### A.     Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence

in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**B.      Tipper and Tippee Liability for Insider Trading under Rule 10b-5**

Section 10(b) makes it "unlawful for any person * * * [t]o use or employ, in connection with the purchase or sale of any security * * * any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe * * *." 15 U.S.C. § 78j(b). As promulgated by the SEC, Rule 10b-5 makes it unlawful for any person:

(a)      To employ any device, scheme or artifice to defraud,

(b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or

(c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Trading on the basis of material, non-public information violates these sections when the trading occurs in connection with the breach of a fiduciary duty. *Dirks v. SEC*, 463 U.S. 646, 663 (1983); see also *Chiarella v. United States*, 445 U.S. 222, 232-36 (1980); *SEC v. Cherif*, 933 F.2d 403, 410 (7th Cir. 1991). A person is liable for insider trading when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose, and then (c) misappropriates or otherwise misuses that information (d) with *scienter*, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." *Dirks*, 463 U.S. at 654; *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981).

There are two theories under which a breach of fiduciary duty can be established such

that a violation of Rule 10b-5 arises: (1) classical theory, and (2) misappropriation theory. *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). "'Under the classical theory, a person violates [Rule 10b-5] when he or she buys or sells securities on the basis of material, non-public information and at the same time is an insider of the corporation whose securities are traded.'" *Id.* (quoting *Cherif*, 933 F.2d at 409). The misappropriation theory "extends the reach of Rule 10b–5 to outsiders who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade." *Cherif*, 933 F.2d at 409. "In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997). Thus, under the misappropriation theory, a corporate "outsider" and his tippees can be held liable for the misappropriation of material, non-public information from its lawful possessor. *Maio*, 51 F.3d at 630; see also *SEC v. Michel*, 521 F. Supp. 2d 795, 822 (N.D. Ill. 2007). When an outsider misappropriates confidential information from his source of the information, he is considered to be breaching a fiduciary duty owed to the source in violation of Rule 10b–5. *Id.*

For an individual to be held liable under a misappropriation theory, the SEC must prove the misappropriation of material, non-public information; in breach of a fiduciary duty; in connection with the purchase or sale of securities; and the requisite *scienter*. *Michel*, 521 F. Supp. 2d at 822-23 (citing *Maio*, 51 F.3d at 631). "Tipper liability (and the tippee liability derived from it), the Supreme Court noted in *United States v. O'Hagan*, 521 U.S. 642 (1997), is a species of the 'misappropriation' theory of liability." *U.S. v. Evans*, 486 F.3d 315, 322 (7th Cir. 2007). "Trades by tippees are attributed to the tipper." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980).

### III.    Analysis

#### A.    Ralph J. Pirtle

Pirtle is the alleged tipper in this case.  Pirtle is entitled to summary judgment if the SEC has failed to present sufficient evidence for a reasonable jury to conclude that he (1) had a relationship of trust with Philips, (2) breached that duty by communicating material nonpublic information to Berrettini in violation of his duty of confidentiality, (3) "received a direct or indirect personal benefit, including even a gift," and (4) acted with *scienter*.  See *United States v. Evans*, 486 F.3d 315, 323 (2007).  In support of his motion for summary judgment, Pirtle admits he had a relationship of trust with Philips, but argues that the SEC has failed to carry its case on the other elements: breach, benefit, and *scienter*.

#### 1.    Breach Involving Material Nonpublic Information

According to Pirtle, Philips regularly used Berrettini as a consultant; his decision to use Berrettini as a consultant for due diligence on Lifeline, Invacare, and Intermagnetics was consistent with that practice; and that in using him on those projects, he gave Berrettini "only the basic geographic parameters needed to complete each assignment and not the names of the companies, the nature of their businesses or any other identifying information."

The first problem with Pirtle's position is that it overlooks the difference between hiring Berrettini as a consultant and hiring him as a consultant on confidential due diligence projects. The SEC has presented ample evidence that Philips understood that difference to be significant. For example, as a member of the due diligence team for Lifeline, Pirtle received a "Confidentiality and Insider Trading Notice" (quoted above) explaining that "If you believe that

it is necessary to add someone to the team or to disclose it someone other than another team member, you are required to seek the prior permission of [Paul Bromberg, Edo Pfennings, Maarten Kwik, or Arno van Hekesen]." Pirtle testified that may have told somebody, maybe Edo Pfennings, that he was going to use Berrettini to assist him with due diligence. But Pfennings does not remember any such request and, moreover, he testified that permission, if given, would have been in writing. Pfennings' testimony is reinforced by other Philips officials who led the due diligence teams for Lifeline, Invacare, and Intermagnetics. Based on their testimony, a reasonable jury could conclude that (1) Pirtle never asked for permission to have Berrettini assist on due diligence for Lifeline, Invacare, or Intermagnetics, (2) permission would have been required to for Pirtle to use Berrettini/Berco as Defendants testify that Pirtle did, (3) permission, if granted, would have been in writing, and (4) no such permission was in fact granted.

That is sufficient evidence of Pirtle's breach of a duty to Philips, but to avoid summary judgment the SEC needs to present evidence of more than just a breach. It must also support its claim that Pirtle's breach of duty to Philips involved communication of material, nonpublic information to Berretini. Defendants think the SEC has failed to do that because the Defendants have testified that Pirtle only asked Berrettini to research certain submarkets around Boston, Cleveland, and Albany. That general geographical information, Defendants argue, does not amount to a "tip" sufficient to incur liability under Rule 10b-5.

Defendants' argument assumes that the Court needs to decide whether bare geographical information amounted to a material tip. Of course, that is not right. To see the case that way would require the Court to completely credit Defendants' testimony and ignore any other circumstantial evidence. But it is Defendants who have moved for summary judgment, and so it

is the SEC, not Defendants, that is entitled to a favorable view of the evidence and to have reasonable inferences drawn in its favor. *SEC v. Rozak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007). Furthermore, it is not the SEC's burden to present *direct* evidence of Pirtle advising Berrettini to buy shares in Lifeline, Invacare, or Intermagnetics. As many courts have observed, "direct evidence is rarely available in insider trading cases, since usually the only witnesses to the exchange are the insider and the alleged tippee, neither of whom are likely to admit liability." *Id.*

The Court is therefore bound to consider the circumstantial evidence that Pirtle shared material nonpublic information with Berrettini in connection with Berrettini's stock purchases. And there is plenty of it. To begin, Philips' interest in the particular geographical areas that Berrettini (or Ezio) claims to have researched was nonpublic. The question is whether the Court should infer that Pirtle provided *material* information to Berrettini — including but not necessarily limited to the general geographical information — in connection with Berrettini's trades. "Information is considered material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to invest." *Id.* at 888 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Making that determination requires "delicate assessments of the inferences a reasonable investor would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* at 888-89 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

Berrettini's own testimony is that he is an unsophisticated investor, without much experience trading stock. Pirtle contacted him after receiving due diligence assignments related to Lifeline, Invacare, and Intermagnetics. And "contact" does not quite capture it. Soon after Pirtle joined the Lifeline team, Pirtle and Berrettini spent four days in Las Vegas together.

17

During that trip, Berrettini gave Pirtle a check payable to the casino for $15,000. Soon after, Berrettini began to make substantial purchases of stock. And Berrettini's purchases, the biggest he had ever made, were remarkably prescient. Soon after, Berrettini bet again on two more companies after talking to Pirtle.

This may look bad, Defendants argue, but that is only if the Court forgets about the public information about Philips' interest in medical services companies. It was public information, Defendants argue, that turned Berrettini into a remarkably savvy trader. Defendants can present that argument to the jury. At this point, based on the summary judgment record, and looking at the evidence in a light most favorable to the nonmovants, there is plenty of evidence to support an inference that Pirtle breached his duty of confidentiality to Philips and provided material nonpublic confidential information to Berrettini about Philips' interest acquiring Lifeline, Invacare, and Intermagnetics.

## 2. Benefit to Pirtle

Defendants argue that the SEC has not put forward evidence that would allow a reasonable jury to conclude that Pirtle got a benefit from his tips. The Court respectfully disagrees. "[T]he concept of gain is a broad one, which can include a "gift of confidential information to a trading relative or friend.'" *Evans*, 486 F.3d at 321 (quoting *Dirks*, 463 U.S. at 664). "The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Dirks*, 463 U.S. at 664. See also *Steffes*, 805 F. Supp. 2d at 615.

In this case, Defendants are open about their friendship. As they describe it, their friendship is rooted in a business relationship, goes back more than ten years, and is sufficiently close that they would spend time socializing in Las Vegas together. But even setting aside

whether a jury could decide that Pirtle benefitted by giving a nice gift of information to an old friend, there is the money — whether called loans or bribes or gifts. By any description, the transfers would constitute a benefit. Defendants remind the Court that there were many transfers, and that they only look bad when focusing on the two that closely coincided with the Lifeline and Invacare trades. The payments started years before the trades at issue in this case and continued after. What's more, Defendants testify that Pirtle has repaid Berrettini with interest and on time. That, once again, is an argument Defendants can try on the jury. First, the fact that there were many payments to Pirtle and that only some are close in time to the trades does not come close to entitling Pirtle to summary judgment on this issue. Berrettini allows that he was happy to give the loans to Pirtle because Pirtle brought him business. A reasonable jury could conclude that inside information about Philips' business plans was just one of the things that Berrettini was paying Pirtle for. The fact that Berrettini gave Pirtle money to extract legal benefits does not immunize the transfers that involved illegal benefits. Moreover, Pirtle only began repaying the "loans" in 2008, once Defendants knew about the SEC investigation. The jury will also, therefore, be free to conclude that the entire legitimate loan story is untrue.

### 3.    *Scienter*

*Scienter* is "a mental state embracing intent to deceive, manipulate, or defraud." *Dirks*, 463 U.S. at 663 n. 23 (quoting *Ernst & Ernst v Hochfelder*, 425 U.S. 185, 193 (1976)). Pirtle argues that the SEC has failed to carry its burden on *scienter* because it has failed to offer sufficient evidence that Pitle acted *willfully*. Willfulness, however, is not the standard in civil Rule 10b-5 cases. "[E]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or

recklessly [* * *]." *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 n. 3 (2007)).

That said, the disposition of Pirtle's motion does not turn on the difference between willfulness and recklessness or the gradations of recklessness. Pirtle concedes that he intentionally gave Berrettini at least some information that came from his participation on the due diligence teams for Lifeline, Invacare, and Intermagnetics. The Court has already concluded that the SEC has presented enough evidence for a reasonable jury to conclude that Pirtle did so in violation of his duty of confidentiality to Philips and that the information he provided to Berrettini was material. It is a short step to the conclusion that Pirtle did so (at least) *recklessly*. Pirtle received unequivocal notices about the need for strict confidentiality surrounding due diligence and the process that had to be followed if he wanted to use a contractor to help him complete his assignments. Despite that, there is evidence that Pirtle did not follow Philips' rules about using contractors on due diligence projects and, in addition, he did not follow Philips' rules about receiving money from contractors, all while giving that same contractor information — even just geographical information — bearing on Philips' possible acquisitions. The SEC has presented enough evidence for a jury to conclude that Pirtle acted with *scienter*.

Pirtle thinks that Ezio's notes — purportedly made when Berrettini passed Pirtle's research assignments to his son, Ezio — demonstrate that Pirtle did not give Berrettini the names of the companies Philips had targeted for acquisition and only asked Berrettini for market research about certain geographical areas near three cities. Pirtle, in other words, was just doing his job, using outside vendors as usual, and, therefore, did not act with *scienter*. This argument is unpersuasive. *Even if* Ezio's notes are authentic and faithfully memorialize "research projects" given to Ezio after his dad talked to Pirtle — two conclusions that, of course, the jury is not

bound to reach — a reasonable jury could still conclude that the research projects were a thin cover for the Defendants' illegal conduct, especially given the evidence that Pirtle flouted Philips' rules about due diligence confidentiality and contractors. Moreover, it should go without saying that an illicit tip could be given with *scienter* even if it is given as a definite description (*e.g.*, the south suburbs of Boston) instead of a name (Lifeline). To recklessly or intentionally give a *coded* tip that the tippee can decode is still to recklessly or intentionally give a tip.

The SEC has carried its burden on every element of each of its claims against Pirtle. Pirtle's motion for summary judgment is therefore denied.

### B.     Morando Berrettini

Berrettini, the alleged tippee, could be liable for insider trading if (1) Pirtle misappropriated material, nonpublic information and shared it with Berrettini; (2) Pirtle did so in breach of his duty to Philips; (3) in connection with Berrettini's purchase of shares of Lifeline, Invacare, or Intermagnetics; and that (4) Berrettini acted with the requisite *scienter*. See *Michel*, 521 F. Supp. 2d at 823. In denying Pirtle's motion for summary judgment, the Court already addressed most of these elements. Specifically, the Court already concluded that the SEC has presented sufficient evidence for a reasonable jury to conclude that Pirtle misappropriated material, nonpublic information and shared it with Berrettini, in violation of his duty to Philips and in connection with Berrettini's purchase of shares of Lifeline, Invacare, and Intermagnetics. The only element of the SEC's claims against Berrettini that the Court has not yet addressed is whether Berrettini acted with *scienter*, that is, whether Berrettini "knew or should have known that the information he traded on was misappropriated." See *Michel*, 521 F. Supp. 2d at 823.

1.     *Scienter*

In support of his motion, Berrettini argues that his research for Pirtle on certain real estate markets in Boston, Cleveland, and Albany was just more work from a great client that he had no reason to suspect involved confidential information that he could not use in deciding to buy or sell stocks.  After all, Pirtle is not in the Mergers & Acquisitions department, and Pirtle, Berretini says, did not tell him he was working on an acquisition.  And when Berrettini told Pirtle that he was going to buy shares in Lifeline, Berrettini says that Pirtle did not unequivocally tell him not to.  How should he know that he was using information he shouldn't have had?

The answer is not complicated.  Berrettini testified that he understood that if Pirtle had told him directly that Philips was going to acquire Lifeline, he could not have bought stock in Lifeline.  That he understood (as someone with decades of business experience and a law degree) would have been insider trading.  In seeking summary judgment, Berrettini argues that there is a legal difference between being told outright that Philips was considering acquiring Lifeline, Invacare, or Intermagnetics and being given information that allowed him to generate a "hunch" that Philips was considering acquiring those companies.  Whatever role the public information may have played — and given on Berrettini's limited experience in the stock market, there are reasons to doubt that it played much of a role at all — Berrettini's own testimony is that without information from Pirtle, he could not have developed his hunch, and would not have spent over one million dollars on shares of those companies.  Berrettini's testimony on this point is surprisingly clear:

Q:     What was your hunch?

A:     My hunch was that Lifeline was a possible acquisition of Philips as was Invacare where I was wrong and Intermagnetics where I was right.

Q:      Did you have a hunch that Philips was going to purchase Lifeline?

A:      I did.

Q:      When did you first have that hunch?

A:      It developed.  I can't tell you when.  But it arose as a result of the call I received from Ralph Pirtle.

Q:      Was that in December of 2005?

A:      Yes, I believe. * * *

Q:      What was the basis for your hunch that Philips was interested in buying Lifeline?

A:      It was — the basis was the call that I received from Ralph Pirtle. I got a call.  Do you want me to explain the basis?

Q:      Yes, please.

A:      I got a call from Ralph saying that he needed some information very quickly; market information; and that the market information that he wanted was with regard to generally warehouse, 100,000 square feet with 10 to 15 percent office.  And he gave me certain geographic areas that I was to look in, and he said he needed it very quickly.

            My routine — part of his — the assignment was also — the market data was to include sale or value — building value data, which is generally sales data, and lease rates.

            So my typical questions were, one, can you tell me what division it's for. And he didn't answer.  He did not give me an answer to that.  He says — and I do not recall the exact response, but it was not an answer.

Berrettini goes on to say that Pirtle gave him permission to tell people that it was Philips that was interested in these submarkets.  All that information — that Pirtle did not tell him the division he was working for, that he wanted sales data, and that he wanted to information unusually quickly — plus public information about Philips interest in medical services, as Berrettini himself put it, "caused [his] antennas to go up."

Berrettini insists that he then connected the dots between Philips' general interest in medical services companies and its specific interest in Lifeline, Invacare, and Intermagnetics. Also according to Berrettini's version of events, the critical information that made his insights possible was the geographical information that he got from Pirtle and the way that Pirtle asked him to research submarkets in those areas. See *Steffes*, 805 F. Supp. 2d at 610 ("it is well established that a defendant can be held liable for insider trading when he or she obtains and acts on pieces of information, which, 'piece[d] together' constitute material nonpublic information.").

Despite all that he has admitted, Berrettini denies that he has admitted *sceinter*. At most, he admits that he was told *indirectly* that Philips was interested in Lifeline, Invacare, and Intermagnetics. He understood that he could not have acted on a direct tip about Philips' confidential business plans, and the SEC has not presented evidence of that. But the SEC, of course, may make its case by circumstantial evidence. See, *e.g., SEC v. Horn*, 2010 WL 5370988, at *4 (N.D. Ill. Dec. 16, 2010) ("Direct evidence of insider trading is, indeed, rare; and the SEC is entitled to prove its case through circumstantial evidence.") (citing cases). Besides*,* whether the tip is direct or indirect, subtle or overt, the insider trading problem is the same: the tippee is trading on information that was improperly disclosed to him. See *Dirks*, 463 U.S. at 660 (tippees are liable under Rule 10b-5 "not because they receive inside information, but rather because it has been made available to them *improperly*"). Looking at the evidence in a light most favorable to the SEC, the nonmovant, if Berrettini actually knew that he could not act on a direct tip about Philips' acquisition targets, a reasonable jury could conclude that Berrettini knew or should have known that he could not act on a subtly disclosed tip about Philips' acquisition targets. And on top of that, when Berrettini told Pirtle that he was going to trade in Lifeline,

Berrettini says that Pirtle said "don't do anything based on what I told you." A jury reasonably could conclude that Pirtle's admonition should have caused Berrettini's "antennas to go up," too.

Finally, Berrettini's admission that information from Pirtle motivated his decision to buy stock in Lifeline, Invacare, and Intermagnetics needs to be viewed in the broader context of this case. Defendants talked frequently, they spent time together in Las Vegas, and Berrettini was giving Pirtle tens of thousands of dollars. Berrettini was not an experienced trader, but nevertheless managed to make several extraordinarily well-timed trades in Lifeline, Invacare, and Intermagnetics. In this context, and remembering that at this stage the evidence must be viewed in a light most favorable to the SEC, the SEC has carried its burden: Berrettini knew *or should have known* that he had received and was acting on information that he shouldn't have. He is not entitled to summary judgment.[2]

## IV.     Conclusion

Defendants' motions for summary judgment [87, 90] and Defendant Pirtle's motion to strike [122] are respectfully denied.

Dated:  November 15, 2012

_____
Robert M. Dow, Jr.
United States District Judge

---

[2] In counts IV-VI of its complaint, the SEC alleges in the alternative that Berrettini is liable for insider trading, not as Pirtle's tippee, but as a Philips insider who intentionally misappropriated material nonpublic information for his own benefit in violation of his fiduciary duty to Philips. See, *e.g., O'Hagan*, 521 U.S. at 652-53. Given Defendants' arguments on summary judgment, the Court must deny Berrettini's motion for summary judgment on these counts too. Berrettini testified that he worked on dozens of projects for Philips between 2000 and 2006. He further testified that his research on particular real estate markets in Boston, Cleveland, and Albany was for Philips; the research was just another project. At least once, Berrettini signed a "preferred vendor" agreement with Philips containing a duty of confidentiality. Pirtle testified that Berrettini was a fiduciary of Philips. That is enough to support the SEC's prima facie case. Having met its burden on that point, the SEC's argument in support of this alternative theory is the same as the main one: Berrettini relied on material nonpublic information about Philips' business plans in deciding to buy stock in Lifeline, Invacare, and Intermagnetics. As the Court already explained, at this stage of the litigation, those points are adequately supported.