**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 10-cv-1614 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| MORANDO BERRETTINI and RALPH J. PIRTLE, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The SEC brings an insider trading action against Defendants Morando Berrettini ("Berrettini") and Ralph Pirtle ("Pirtle"). Before the Court are the SEC's motions *in limine* numbers 7 through 10 [191-94]. For the reasons stated below, the Court denies the SEC's motion *in limine* number 7, grants in part and denies in part the SEC's motion *in limine* number 8, reserves final ruling on the SEC's motion *in limine* number 9, and grants in part and denies in part the SEC's motion *in limine* number 10.

**I.      Background**

The background of this insider trading case, knowledge of which is assumed, is set forth in the Court's Opinion and Order [135] denying Defendants' motions for summary judgment.

**II.     Legal Standard**

A motion *in limine* is a motion "at the outset" or one made "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014). The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in*

*limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997) (observing that, when used properly, the motions may sharpen the issues for trial). The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009).

Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989); see also *Luce*, 469 U.S. at 41-42 ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). In addition, if an evidentiary issue raised in a motion *in limine* "cannot be evaluated accurately or sufficiently" prior to trial, it is appropriate to defer ruling until trial. *Jonasson*, 115 F.3d at 440 (delaying until trial may afford the judge a better opportunity to estimate the evidence's impact on the jury).

## III.    Analysis

The SEC asks the Court to exclude (1) Berrettini's Mesirow trading record and tax return from 1999; (2) evidence or arguments about Berrettini's stock trades after May 2006; (3) online articles addressing Philips' acquisition plans, Lifeline's performance, and Philips' supply agreement with Intermagnetics; and (4) Ezio Berrettini's testimony or notes regarding his conversations with Berrettini about the research that Pirtle assigned Berrettini. The Court addresses each motion in turn.

## A. Motion *In Limine* No. 7 to Exclude Berrettini's Trading Record and Tax Return From 1999

The SEC moves to exclude Berrettini's Mesirow brokerage statement and income tax return from 1999 (Berrettini Exs. 94, 95) on the ground that Berrettini failed to produce these documents during discovery. Parties generally have a duty to produce documents during discovery that they "may use to support [their] claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Parties also must supplement or correct disclosures or responses in a timely manner if they learn that they are incomplete or incorrect. Fed. R. Civ. P. 26(e)(1)(A). One purpose of these requirements is to "prevent surprise at trial." *Talbert v. City of Chicago*, 236 F.R.D. 415, 421 (N.D. Ill. 2006). See also *Gicla v. United States*, 572 F.3d 407, 411 (7th Cir. 2009) ("Rule 26 is designed to avoid surprise[.]"). If a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The determination of "whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citation and internal quotation marks omitted). The following factors guide the Court's discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

During discovery, the SEC requested from Berrettini "all documents that you expect or reserve the right to use at summary judgment or at trial." [191-1] at 2 (Second Set, Document Request 1). In response, Berrettini represented that he produced "all responsive documents in his possession, custody, or control[.]" [191-1] at 3. The SEC also requested, specifically, "[a]ll

documents reflecting securities or commodities brokerage accounts and accounts at banks or other financial institutions in your name, under your control, in which you have or had a beneficial interest, or to which you were a signatory." [191-2] at 6 (First Set, Document Request 3). In response, Berrettini produced "all brokerage account records for all accounts Berrettini controlled for a period spanning from years before the trades at issue through up to two years after the trades at issue" (2008), but refused to produce documents from any later period. [59] at 8. The SEC did not specifically request Berrettini's 1999 tax return; instead its request for tax returns was limited to the period covering January 1, 2004 to the present. [191-1] at 6 (First Set, Document Request 18). Berrettini refused to produce the tax returns. Magistrate Judge Nolan ruled on the SEC's motion to compel, determining that: 1) Berrettini was not required to produce brokerage or bank statements from 2009 or 2010; and 2) Berrettini's tax returns were not relevant unless placed at issue by the defendant, and therefore Berrettini was not required to produce them. [69] at 3. Berrettini did not include the 1999 brokerage statement or the 1999 tax return in the documents produced during discovery, and now seeks to use those documents at trial.[1]

Because Berrettini failed to produce the documents during discovery, he may not introduce them in support of his defense at trial unless his late disclosure is "*either* justified *or* harmless." *David*, 324 F.3d at 857 (emphasis added). Berrettini argues that his late disclosure was "justified" because, after the cutoff for fact discovery, the SEC produced an expert report by Michael Mayer placing Berrettini's 1999 brokerage statement and tax return at issue. The report,

---

[1] In his exhibit list, Berrettini admits that the 1999 tax return was not produced during discovery. See [187-14] at 9, Ex. B95. His exhibit list states that the 1999 brokerage statement was provided as "[p]art of original discovery presented to [the] SEC." *Id.*, Ex. B94. However, in response to motion *in limine* number 7, Berrettini admits that he did not find the document until around September 2013, after discovery closed. See [206] at 3.

which the SEC produced on November 4, 2011, discusses whether Berrettini's allegedly unlawful trades were consistent with his trading history. According to Berrettini, Mayer's conclusions are inaccurate because they are based on incomplete trading data. Berrettini asserts that the Mayer report "prompted" him to "once again search for past records to find stock trading evidence to contradict or correct" Mayer's findings. [206] at 3. Nonetheless, he "was not able to find such records" until nearly two years later, in September 2013, when he was cleaning out a storage area in a building where he had his office. *Id*. Berrettini asserts that these "records and documents were subsequently provided to the SEC," but does not identify when this occurred. See *id*. According to the SEC, it first received the documents on July 6, 2015. Berrettini does not dispute the SEC's version of events.

The Court is not persuaded that Berrettini's late disclosure of the 1999 brokerage statement and tax return was "justified" based on the timing of the Mayer report. Even if November 4, 2011 was the first time Berrettini learned that his trading history would be at issue,[2] and even if Berrettini did not find the 1999 brokerage statement and tax return until September 2013, he fails to explain why it took until July 2015 to turn these documents over to the SEC.

Although Berrettini's late disclosure does not appear to be "justified," Berrettini is nonetheless allowed to use the documents at trial if such use would be "harmless." *David*, 324 F.3d at 857. The SEC has not identified any harm that it would suffer if Berrettini is allowed to introduce the documents at trial. The documents were produced nearly three months prior to the scheduled start of trial, and the SEC does not contend that the late production of documents has inhibited its ability to prepare for trial. Instead, it appears that the SEC intends to rely on Mr. Berrettini's trading history to support its own position that the trades at issue here were not

---

[2] The parties' discovery motions make clear that Berrettini was on notice that his trading history would be at issue prior to Mayer's report. See [69] at 3.

consistent with Mr. Berrettini's prior trading history. Moreover, even if Berrettini was prohibited from introducing the disputed documents in his defense, he nonetheless may well be allowed to introduce them in his cross-examination of Mayer to the extent that Mayer testified about Berrettini's trading history.[3] For these reasons, the Court concludes that the late production of the 1999 brokerage statement and tax return was harmless. Accordingly, the Court denies the SEC's motion *in limine* number 7.

> **B.      Motion *In Limine* No. 8 to Preclude Berrettini From Offering Evidence or Making Arguments About His Stock Trades After May 2006**

The SEC moves to preclude Berrettini from offering evidence or making arguments about stock trades after May 2006, when he made his last allegedly unlawful trade. In particular, the SEC objects to Berrettini Exhibits 92, 93, and 147. Exhibits 92 and 93 are schedules of realized gains and losses on Berrettini's investment in Dollar General Corp. in 2006 and 2007. [207] at 14-16. Exhibit 147 includes Berrettini's hand-written adjustments to the Mayer Report's summary of Berrettini's stock investments from 2001 to 2006. [207] at 18-24. The adjustments expand Mayer's timeframe in both directions, including stock investments from 1998 and 1999 as well as Berrettini's 2007 investments in Dollar General.

The SEC does not assert that Berrettini failed to produce Exhibits 92, 93 or 147 during discovery.[4] Instead, the SEC argues that Berrettini should be precluded from "offering any evidence or making any arguments at trial about any stock trades after May, 2006" because

---

[3] As discussed at the most recent pre-trial conference, given the relevance of Berrettini's trading history and the date parameters selected by Mayer for his analysis and report, a potential line of inquiry on cross-examination should Mayer testify—he is currently one of the SEC's "may" call, not its "will" call witnesses—would be whether Mayer's conclusions would change if the trades from 1999 were taken into consideration.

[4] Berrettini's exhibit list indicates that Exhibits 92 and 93 were provided as part of the "original discovery presented to [the] SEC." [187-14] at 9. Exhibit 147 could not have been provided during discovery because it is a mark-up of the Mayer Report, which was produced following the close of fact discovery.

Berrettini successfully opposed on relevance grounds the SEC's motion to compel the production of brokerage and bank statements from 2009 and 2010. See [192] at 1-2. The legal basis for Berrettini's opposition was that only his prior trading history, and not his trades after 2006, was relevant to whether he engaged in insider trading. See [69] at 3. The SEC asserts that, "[h]aving argued successfully that post-2006 trading is not relevant, Berrettini cannot now offer evidence about his post-2006 trades." [192] at 3.

Berrettini responds that his change in position is justified because, after the close of fact discovery, the SEC disclosed that one of its experts would opine at trial concerning whether "Mr. Berrettini's trading in Lifeline Systems, Invacare and Intermagnetics was consistent with his *earlier* trading history." [207] at 2 (emphasis added). According to Berrettini, the Mayer Report "give[s] the wrong impression that Berrettini's trading in Lifeline and Intermagnetics was outside his normal trading pattern with regard to size and hold time," which Berrettini intends to correct by providing information concerning his post-2006 trades. *Id.* However, it should be no surprise to Berrettini that the SEC intends to introduce expert testimony concerning the consistency of the alleged illegal trades with his earlier trading history. Berrettini recognized in 2011 when the parties were briefing the SEC's motion to compel that "Berrettini's prior trading history—meaning his trading before the alleged illegal trades—may be relevant" to the issue of whether Berrettini engaged in insider trading. [59] at 7. Berrettini also fails to explain how evidence of post-2006 trades is relevant to Mayer's opinion, which opines concerning whether the alleged illegal trades were consistent with his *earlier* trading history—not his subsequent trading history. Assuming that Berrettini is correct that the post-trade evidence is not relevant to the issue of whether Berrettini acted with scienter in making the trades at issue—a position that

he has not retracted and that appears to be consistent with the case law[5]—then it likewise should not be admissible as evidence that Berrettini *lacked* scienter while making those trades.[6]

In view of the foregoing discussion, the Court grants the SEC's motion *in limine* number 8 as it relates to exhibits regarding Berrettini's stock trading after the May 2006 trades giving rise to the SEC's complaint because those trades do not appear to be relevant to any disputed issue at trial.[7] However, as to Exhibit 147's adjustments based on trades from 1998 to 1999, the SEC's argument does not address why these adjustments should be excluded, given that they relate to past trades, not subsequent trades. Accordingly, the Court denies the SEC's motion to the extent that it seeks to exclude mention of Berrettini's trades from 1998 or 1999.

### C.    Motion *In Limine* No. 9 to Exclude Certain Online Articles

The SEC moves to exclude the online articles in Berrettini Exhibits 63 and 65-72 (see [193-1]) and Pirtle Exhibits D-L to D-S (see [193-2]). Berrettini has agreed to withdraw Exhibits 65 and 70-72. See [208] at 2. Accordingly, the question is whether Berrettini may introduce Exhibits 63 and 66-69 and whether Pirtle may introduce Exhibits D-L to D-S. The exhibits at

---

[5] See *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *13 (N.D. Ill. Sept. 23, 2008) ("What plaintiffs have not alleged is that defendants' sale of stock was out of line from their *previous* trading history. Defendants have provided this court with their trading history for 2005 into 2006, which demonstrates that the sales made during the class period were not unusual, either in scope or in timing, when compared with *previous* sales, negating an inference of scienter." (emphasis added)); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 955-56 (N.D. Ill. 2003) ("In order to rise to the level of 'unusual' or 'suspicious,' the insider trading must be 'dramatically out of line with *prior* trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" (emphasis added) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999))); see also *In re Pixar Securities Litig.*, 450 F. Supp. 2d 1096, 1104 (N.D. Cal. 2006) (same).

[6] One additional reason for excluding evidence of trades after the alleged insider trading is the possibility of manipulation by the accused investor in an attempt to camouflage the unlawful activity.

[7] The ruling is provisional in that the Court cannot anticipate every conceivable scenario in which evidence might be relevant at trial. If Berrettini feels that the post-May 2006 trades may be relevant to an issue other than scienter, he may request reconsideration of this ruling at an appropriate time and outside the presence of the jury.

issue generally consist of online news articles, press releases, and press reviews, discussing Philips' plans to acquire medical services, equipment, or device businesses; Lifeline and Intermagnetics' strong performance in that market; and Philips' existing supply contract with Intermagnetics. Defendants offer these exhibits to support their arguments that Pirtle did not give Berrettini material, non-public information; that there was contemporaneous public information indicating that Lifeline and Intermagnetics were potential acquisition targets of Philips; and that Berrettini decided to purchase the stocks in question based, in part, on this information. The SEC moves to exclude these articles on three grounds: (1) that Berrettini neither read the articles nor disclosed them during discovery; (2) that Defendants cannot authenticate the exhibits; and (3) that the articles are irrelevant. The Court considers each argument in turn.

### 1.    Berrettini's Failure to Disclose the Exhibits During Discovery

As to the first argument, Berrettini did not produce copies of the disputed articles during discovery either affirmatively or in response to the SEC's discovery requests. The SEC served an interrogatory asking Berrettini to "[d]isclose in detail all of the 'independent research' that you allegedly performed or received before purchasing or selling the securities of Lifeline, Invacare, and Intermagnetics." [193-3] at 5 (Interrogatory 6). The SEC requested a "complete description of the research," as well as the "source and content of the information." *Id.* Berrettini's response, served in July 2011, did not disclose any of the articles in Exhibits 63 and 66-69. It did refer to Berrettini's investigation testimony, but that testimony did not specifically identify the articles in question. The closest Berrettini came to identifying one of the articles was his testimony that he did a "little research on the Internet" on Lifeline and learned that "it was touted by Forbes as being in the top 200 small companies." [193-4] at 6 (85:16-17); see [193-1]

at 10 (Ex. 66) (stating in the headline that Lifeline was "Named to Forbes 200 Best Small Companies List for Fourth Consecutive Year"). Berrettini did not amend the interrogatory response at any point. The SEC also served Berrettini with a document request for "all documents that refer or relate to your purchase and sale of the securities of Lifeline, Invacare, or Intermagnetics." [193-6] at 4 (Document Request 7). This request specifically requested "all 'research' that you allegedly performed or received before purchasing and selling the securities." *Id.* The SEC also requested all documents that he might offer at trial to support his defenses. [193-6] at 2 (Document Request 1). Berrettini did not produce any of the disputed articles in response to the SEC's document requests.

Pirtle, however, did include his exhibits in his summary judgment briefs. See [89-12] through [89-19]. The SEC did not object to the inclusion of these exhibits in its summary judgment briefing (at least as to Pirtle), although the SEC did argue then (as it does now) that the articles are irrelevant because Berrettini did not read them. Pirtle argues that the *David* factors therefore weigh against exclusion. The Court agrees. As to the first factor, there should be little surprise that Pirtle seeks to introduce Exhibits D-L to D-S based on his summary judgment briefing. As to the second factor, the SEC has had approximately three years to cure any prejudice. As to the third factor, the SEC does not argue that disruption is likely. As to the fourth factor, again, Pirtle did disclose the documents on an earlier date. Exclusion on this basis is therefore unwarranted.

The remaining question is whether Berrettini should be barred from introducing his exhibits based on his own failure to disclose them during discovery. The framework set out by the Seventh Circuit in *David* applies. On the one hand, Berrettini does not have a compelling reason for not conducting in 2011 the same inquiry he undertook in 2015, as the documents

located clearly are responsive to the SEC's discovery requests. Moreover, to the extent that Berrettini is relying on his memory in identifying the relevant articles, it seems doubtful that his recall would be better now than it was four years ago. Although the Court would be hard-pressed to conclude that the failure to respond in 2011 rises to the level of willfulness under *David*,[8] it was at least negligent of Berrettini not to have conducted at least as thorough a search for responsive documents while discovery was open as he did in preparing for trial.

With that said, Pirtle and Berrettini seek to introduce several overlapping exhibits[9] to make the same argument: that Berrettini purchased the three stocks based on public information in the articles. Berrettini's added introduction of the same articles to make this argument would prejudice the SEC minimally and is therefore harmless within the meaning of Rule 37. As to the two remaining exhibits at issue (Exhibits 66 and 67), their admission would cause little if any additional prejudice, as they address similar topics to the articles in Pirtle's exhibits. Moreover, as to Exhibit 66, an article stating that Lifeline was "Named to Forbes 200 Best Small Companies," Berrettini's deposition testimony stating that he did online research and learned that Lifeline "was touted by Forbes as being in the top 200 small companies," [193-4] at 6 (85:16-17), put the SEC on notice that the content of the article would be at issue during trial. Accordingly, exclusion of Berrettini's exhibits for failure to disclose them while discovery was open is unwarranted.[10]

---

[8] Given that Berrettini now believes the articles to be helpful to his defense, it would be counterintuitive to believe that he would have willfully refused to produce them years ago during discovery had they been in his possession.

[9] Berrettini Exhibits 63, 68, and 69 match Pirtle Exhibits D-L, D-P, and D-Q, respectively.

[10] Of course, if Berrettini is able to overcome the authentication issues discussed below and thus introduce the articles in question to the jury, he may find them to be a double-edged sword because he may be subject to impeachment based on his prior statements about what he read in the relevant 2005-06 time

## 2. Authentication

The SEC also argues that Defendants will be unable to authenticate any of the articles, because printouts from private websites are not self-authenticating and Defendants have identified no witnesses who could authenticate the articles at trial. Pirtle responds that the documents are self-authenticating or, in the alternative, can be authenticated under Rule 901. [204] at 10-11. Berrettini, by contrast, does not claim that the documents are self-authenticating, and states that he will authenticate the documents at trial. [208] at 13.

The authentication requirement is satisfied if the proponent produces evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901 only "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). Rule 902(6) provides that "[p]rinted material purporting to be a newspaper or periodical" is self-authenticating. Fed. R. Evid. 902(6). Rule 101(b)(6), which was added in 2011, provides that "a reference to any kind of written material or any other medium includes electronically stored information." Fed. R. Evid. 101(b)(6). Although records from government websites generally are considered to be self-authenticating (see *Williams v. Long*, 585 F. Supp. 2d 679, 686-89 (D. Md. 2008)), "exhibits reflecting information from commercial websites must be authenticated by one of the methods allowed by Rule 901, including testimony from a witness with personal knowledge, expert testimony, or reference to distinctive characteristics." *Foreward Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at *3 (W.D. Mich. Oct. 31, 2011) (citing *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 556 (D. Md. 2007)). While the case law in this fast-developing area of the law is by no means uniform,

---

period and the level of detail at which he remembered what he read at that time.

"[t]he lower courts generally hold that an affidavit of a witness, when viewed in combination with circumstantial indicia of authenticity (such as the existence of the URL, date of printing, or other identifying information) would support a reasonable juror in the belief that the documents are what the proponent says they are." *Id*.

The Court concludes that the disputed documents are not self-authenticating under Rule 902(6) because Defendants have not convincingly shown that the documents are comparable to "printed material purporting to be a newspaper or periodical." To be sure, Berrettini Exhibit 63 (which is also Pirtle Exhibit D-L) appears to be a copy of an article that originally appeared in the Wall Street Journal. However, the document contains no URL or other information indicating that the article was obtained from the Wall Street Journal's website or where or when it was obtained.[11] Berrettini Exhibits 66 and 67 are being offered into evidence by Berrettini only, and Berrettini does not argue that they are self-authenticating. Berrettini Exhibits 68 and 69 (which are Pirtle Exhibits P and Q, respectively) appear to be printouts from "The Street" website. However, they do not contain URLs showing where the articles appear on the Internet. It is also unclear whether "The Street" should be considered a newspaper or periodical, and the Defendants do not address this issue. Pirtle Exhibit D-M is a printout from the "Leleux Press Review." It contains no URL and no indication that it is a printout of a newspaper or periodical. Pirtle Exhibits D-N, D-O, D-R, and D-S are printouts of articles that appear in Westlaw's "NewsRoom" database but that were originally published in other publications, such as the Associated Press News and Reuters News. Pirtle cites no case law suggesting that printouts from Westlaw or other archives of articles that were previously published by other newspapers or

---

[11] As discussed at the August 24 pre-trial conference, the SEC agrees that if either Defendant were to procure a photocopy of an actual article from the print copy of the Wall Street Journal (or any other recognized newspaper or periodical) there would be no authentication problem.

periodicals are self-authenticating under Rule 902(6). Therefore, these documents are not self-authenticating and would require authentication before being introduced at trial.

The SEC argues that Defendants will be unable to authenticate the articles that Berrettini did not personally read, because they have not identified any witnesses with the qualifications necessary to establish the documents' authenticity. To the extent that either Defendant personally pulled the articles from the Internet, he could testify about how the process by which he obtained the articles and when this was done. In *Hood v. Cryvit Systems, Inc.*, 2005 WL 3005612, at *2 (N.D. Ill. Nov. 8, 2005), for example, the court found on summary judgment that the plaintiff sufficiently authenticated printouts of pages of the defendant's website by offering an affidavit from the plaintiff's attorney stating that he retrieved the documents from the defendant's website on a particular date.

But standing alone, such testimony would not be sufficient to establish that the material was actually on the website on any date other than the one on which the Defendant did his research. However, in this case Defendants intend to use the articles to prove that the information they contain was publicly available *at the time of* the alleged illegal trades. [204] at 5. The articles are relevant as to this issue only if the articles were publicly available during the 2005/2006 timeframe. Pirtle does not claim to have any personal knowledge concerning whether the articles were publicly available at their original sources on the dates shown on the printouts. Perhaps Pirtle could authenticate the articles based on the "distinctive characteristics" of the websites from which they were allegedly printed, although his current argument in that regard lacks the specificity that would enable the Court to make a reliable assessment. Pirtle claims that Exhibits 63 (D-L), 68 (D-P), 69 (D-Q), and D-M were printed from websites, but none of these exhibits contain URLs showing what websites they came from or dates showing when Pirtle (or

someone else) printed the articles. D-N, D-O, D-R, and D-S are printouts of articles that appear in Westlaw's "NewsRoom" database but that were originally published in other publications. Pirtle has not offered declarations or proposed testimony from witnesses with knowledge concerning the accuracy of the database and the dates contained on articles it republishes. Pirtle might, for example, have offered a declaration from a Westlaw employee explaining its process for determining the date to include on the articles. Without any such support, Pirtle appears to have no basis to for claiming that the articles are what Pirtle claims they are—*i.e.* articles that were publicly available in 2005 and 2006. See *Specht v. Google Inc.*, 747 F.3d 929, 933-34 (7th Cir. 2014) (affirming district court ruling on summary judgment that, in order for plaintiff to rely on website screen shots as evidence that the screenshots reflect how the websites appeared in 2005, it "required authentication by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved"); see also *SEC v. Yang*, Case No. 12-cv-2473, Tr. 98-99 (N.D. Ill. Dec. 19, 2013) (transcript of hearing before Judge Kennelly) (suggesting a similar approach). Cf. *SP Technologies, LLC v. Garmin Int'l, Inc.*, 2009 WL 3188066, at *3 (N.D. Ill. Sept. 30, 2009) (printouts from websites were properly authenticated, for purposes of use during summary judgment, where defendants introduced an affidavit from the manager of the Internet Archive from which the printouts were obtained "who explained how that website saves old web pages" and when defendants' exhibit "was created"); *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, 2004 WL 2367740, at *6 (N.D. Ill. Oct. 15, 2004) (admitting evidence from the Internet Archive when accompanied by an affidavit from an Internet Archive official).

For the same reason, Berrettini's suggestion that he could self-authenticate the internet materials that he found falls short of the mark. The Seventh Circuit has explained that even

where the *creators* of a website "asserted from memory that the screenshots reflected how those sites appeared" on a certain date, "the district court reasonably required more than memory, which is fallible." *Specht*, 747 F.3d at 933. It follows *a fortiori* from *Specht* that if the website creator's testimony alone will not suffice, then any attempt by a *user* of the website to authenticate from memory must fail. Rather, as in *Specht*, proper authentication could be supplied "by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved" (*id.*)—here, Westlaw.

Based on the foregoing discussion, the Court cannot conclude that Defendants have made a sufficiently persuasive case to authenticate their web-based exhibits. Certainly the better course would have been to submit the affidavit of a witness with personal knowledge of the specific archive from which Defendants retrieved the materials. As the court in *Foreward Magazine* explained, courts often rely on "an affidavit of a witness, when viewed in combination with circumstantial indicia of authenticity (such as the existence of the URL, date of printing, or other identifying information)" to establish the *bona fides* of an internet printout that will be shown to a jury as evidence at a trial. 2011 WL 5168493, at *3-4.

However, as discussed at the recent pre-trial conference, the fact that Defendants have not *yet* made a satisfactory showing does not foreclose them from remedying the shortcomings addressed above prior to trial. It may not be too late to obtain the kind of affidavit from personal knowledge that the case law strongly prefers. In addition, the case law does not seem to indicate that a third-party affidavit is an absolute prerequisite, particularly if the "circumstantial indicia of authenticity" are robust and convincing. See, *e.g.*, *Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1091 (N.D. Cal. 2011) (noting that courts evaluating internet print-outs consider the "distinctive characteristics" of the website in determining whether a document is sufficiently

authenticated and finding that print-outs of internet publications had "sufficient indicia of authenticity, including distinctive newspaper and website designs, dates of publication, page numbers, and web addresses"). Defendants have made some references to these characteristics in arguing their points, but if they intend to rely on this basis for authentication, the Court will allow them time to walk the Court (and the SEC) through the exhibits in specific detail to explain why those characteristics should suffice. Finally, as discussed on the record at the August 24 pre-trial, to the extent that Defendants are able before or during the trial to authenticate their articles the old-fashioned way, by locating the original print (or microfilm) versions of the articles, they should advise the Court.

In sum, at present, the Court remains unconvinced that Defendants have appropriately authenticated the internet materials that are the subject of the SEC's motion *in limine* number 9. Nevertheless, the Court will reserve ruling to allow Defendants to marshal their best arguments in light of the discussion set forth above and will issue a final ruling at the earliest opportunity. The parties should be prepared to further discuss the issue at the status hearing that will be held following jury selection on Friday, September 4.

### 3.    Relevance

The SEC alternatively moves to exclude the exhibits on relevance grounds. First, it argues that the articles are irrelevant because Defendants do not plan to argue that Berrettini read the articles and relied on them in deciding to purchase stock in the three companies. But Defendants' responses indicate that they do intend to make this argument, in which case the articles are clearly relevant. To the extent that the SEC believes that such testimony is inconsistent with prior statements (or even fabricated), it is free to impeach Defendants.

Second, Pirtle plans to introduce the exhibits to show that, even if the information that he gave Berrettini was non-public, it was immaterial given the public information in these articles. "For purposes of § 10(b), nonpublic information is considered 'material' if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *S.E.C. v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). "This determination 'requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him[.]'" *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). The SEC asserts that the exhibits are all irrelevant because, while they suggest that Philips was looking to acquire companies, they do not mention the three companies in which Berrettini bought stock. The SEC's "nexus" argument goes to the weight of the proposed exhibits, rather than their admissibility. The information in the articles explains the "total mix" of public information about Philips available to investors at the time of Berrettini's trades and is therefore relevant to the materiality of any private information that Pirtle gave Berrettini. To the extent that the SEC can show a "mismatch" between the information that Pirtle provided to Berrettini and the content of the articles, it may have excellent fodder for cross-examination, but the articles are not so far removed from the issues at trial as to be irrelevant under the legal standard cited above. Accordingly, the SEC's motion *in limine* number 9 is denied as to this ground.

### D.     Motion *In Limine* No. 10 to Exclude Ezio's Notes

The SEC moves to exclude notes taken by Berrettini's son, Ezio Berrettini ("Ezio"), and what they contend is related hearsay. Relevant here is Defendants' account of the following facts: Pirtle, the Director of real estate at Philips, instructed Berrettini, an outside consultant, to

research sales and leases for offices/warehouses in Cleveland, Boston and Albany. Pirtle sought this research in connection with Philips' potential acquisition of Lifeline, Invacare, and Intermagnetics in those cities. But Pirtle did not tell Berrettini that the research related to a potential acquisition, and he did not name any of the target companies. Based on public information regarding Philips' interest in acquiring medical services and equipment companies, Berrettini independently concluded that the research assignment related to Philips' acquisition plans, so he instructed Ezio not only to do the research assigned by Pirtle but also to identify medical services and equipment companies in the three cities. Ezio gave Berrettini the results of his research, identifying several companies, including the three in which Berrettini bought stock.

Ezio's notes consist of one page for each city. The documents contain headings "Building Search," "Market Study," and "Philips" and list various criteria for his searches. For example, under "Building Search," he lists "Warehouse w/ office"; "5-15% office"; "100,000 SF+" and the like. [194-1] at 2. His language also includes instructive language, such as "ASAP!"; "No visit, General Internet search"; and "Also, look for medically related companies in same area." *Id.* Defendants contend that Ezio took these notes during his conversations with Berrettini. The notes also appear to include the results of Ezio's research, including rents and sales in each city and medical equipment companies in each city. See [194-1].

The SEC seeks to exclude Ezio's notes and related testimony on hearsay grounds. Hearsay is "a statement," other than one made by the declarant "while testifying at the current trial or hearing," offered "in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). If a statement constitutes hearsay, then it is inadmissible unless an exception to the hearsay rule applies. Fed. R. Evid. 802. Specifically, the SEC asserts that Defendants cannot use Ezio's notes or testimony to prove: 1) what Pirtle told Berrettini during their one-on-one

conversations; or 2) what Berrettini said to Ezio about a research assignment.  [194] at 2, 5.[12]
The Court agrees that Ezio cannot testify concerning what Pirtle told Berrettini during their one-on-one conversations, as this testimony would be offered to prove the truth of the matter asserted – *i.e.* whether Pirtle actually told Berrettini that he wanted research done concerning rents in the three geographic markets.  Ezio was not a party to such conversations and therefore has no personal basis for testifying about those conversations.

However, Ezio can testify concerning the instructions that Berrettini gave to Ezio. "Instructions to an individual to do something are * * * not hearsay."  30B GRAHAM & GRAHAM, FED. PRAC. & PROC. EVID. § 7005 (2014 ed.).  That is because "[a]n order * * * is not capable of being true or false, and thus it is not offered for the truth of any matter asserted."  *United States v. Keane*, 522 F.2d 534, 558 (7th Cir. 1975).  Here, Berrettini's instructions to Ezio to perform certain research were not "declarations of fact" by Berrettini, but instead were "instructions which carried no hearsay implications."  *Crawford v. Garnier*, 719 F.2d 1317, 1323 (7th Cir. 1983) (district court properly allowed plaintiff in wrongful termination case to testify about instructions that an employment analyst gave the plaintiff about filling out an application with false information, where "[m]ost of the declarations which plaintiff attributed to [the analyst] were not hearsay because they were not statements made by [the analyst] 'offered in evidence to prove the truth of the matter asserted'" and instead were "instructions which carried no hearsay implications").  See also *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011) (holding that a demand note recovered in a bank robbery defendant's rental vehicle was not hearsay because a "command is not * * * an assertion of fact" and the note was not admitted to prove the truth of the only possible factual statements in the note ("I have a gun" and "no one will get hurt")).

---

[12] The SEC recognizes that Berrettini and Pirtle may testify about their conversations with each other.

Defendants may introduce Ezio's notes during this testimony (assuming that they establish authenticity and an appropriate foundation), as the notes appear to memorialize Berrettini's instructions (and thus overcome the hearsay objection) and are clearly relevant to and probative of Berrettini's defense that he traded based on research of publicly available information rather than on tips from Pirtle.

Although it is unnecessary to reach the issue given this conclusion, the Court notes that Ezio's notes might constitute "prior recorded" recollections if Defendants satisfy the requirements set forth in Rule 803(5). Fed. R. Evid. 803(5). A recorded recollection is a record that: "(A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge." Fed. R. Evid. 803(5). "If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party." *Id.* Pirtle asserts that Ezio had difficult remembering during his deposition the research that he performed in the Cleveland, Boston and Albany areas and was only able to recall details of the research at a later deposition when he was shown his notes. [Doc. 205] at 13. The SEC asserts that Ezio remembers the three research assignments well enough to testify fully and accurately about them. See [194] at 9. As support, the SEC points to deposition testimony in which Ezio stated that reviewing his notes would not refresh his recollection of his conversation with his father about the research. *Id.* But this does not demonstrate that Ezio remembers those conversations independent of his notes, and instead tends to show that Ezio does not "fully and accurately" recall the conversations. Fed. R. Evid. 803(5). The SEC also claims that Berrettini "strongly insists" that the past recollection recorded exception does not apply. [217] at 11. However, Berrettini stated in his brief that the exception

"does not merit discussion" because Berrettini does not intend to use the notes "the way the SEC proposes that they will be used"—that is, to provide direct evidence concerning what Pirtle and Berrettini discussed. [209] at 8. Berrettini has not taken a position on whether the exception applies. Based on these facts, the Court notes the issue but reserves ruling on whether Ezio's notes could be read into evidence as a prior recollection recorded. If Defendants find any need to try to establish the three criteria set forth in Rule 803(5), they may advise the Court outside the presence of the jury.

Also, in the interest of completeness, the Court is not persuaded by Pirtle's argument that Ezio's notes and proposed testimony are admissible under Rule 801(d)(1)(B) or Rule 803(3). According to Pirtle, Ezio's notes are admissible under Rule 801(d)(1)(B) to refute the SEC's claims that Defendants fabricated their story that Berrettini's stock purchase were based on his independent research of publicly available material, rather than on tips from Pirtle. "A statement is not hearsay, and admissible as a prior consistent statement under Rule 801(d)(1)(B), if it meets the following four requirements: '1) the declarant testifies at trial and is subject to cross-examination; 2) the prior statement is consistent with the declarant's trial testimony; 3) the statement is offered to rebut an express or implied charge of recent fabrication or improper motive; and, 4) the statement was made *before* the declarant had a motive to fabricate.'" *United States v. Green*, 258 F.3d 683, 690 (7th Cir. 2001) (quoting *United States v. Stoecker*, 215 F.3d 788, 791 (7th Cir.2000)) (emphasis added). The Court agrees with the SEC that this exception is inapplicable because Ezio created his notes *after* Berrettini allegedly received tips from Pirtle, and thus had an immediate, contemporaneous motive to create a paper trail showing that Berrettini did his own research on medical equipment companies in the three markets before trading based on the Pirtle's tips.

Finally, Pirtle argues that Ezio's notes are excepted from the hearsay rule pursuant to Rule 803(3) because they constitute "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3). "Three requirements must be satisfied for a statement to be admissible under the state of mind exception to the hearsay rule: (1) the statement must be contemporaneous with the mental state sought to be proven; (2) it must be shown that declarant had no time to reflect, that is, no time to fabricate or misrepresent his thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case." *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992). "'[T]he act of letter writing usually provides as much time as the writer might want to fabricate or misrepresent his thoughts' so the 803(3) exception generally does not apply." *Id.* (quoting *United States v. Harris,* 942 F.2d 1125, 1130 n.5 (7th Cir.1991)). According to Pirtle, "Ezio's communications with Berrettini and his contemporaneous notes provide direct evidence of Pirtle's and Berrettini's states of mind vis-à-vis their communications about the due diligence research projects and their lack of scienter." [205] at 11. However, Ezio's notes cannot serve as evidence of Pirtle's state of mind, because Ezio never had any conversations with Pirtle. Ezio's notes cannot serve as evidence of Berrettini's state of mind, either, because there is no evidence that Berrettini spoke with Ezio immediately after speaking with Pirtle. See [217] at 10-11. Berrettini stated at his deposition that it may have been the next day before he and Ezio spoke. *Id.* Berrettini had more than "no time" to reflect on what he would tell Ezio about his conversation with Pirtle.

For these reasons, the Court grants in part and denies in part motion *in limine* number 10. Defendants are not barred from introducing Ezio's notes, and Ezio may testify concerning the instructions that Berrettini allegedly gave him. Ezio may not testify as to the contents of Berrettini's conversations with Pirtle.

IV.     **Conclusion**

For the foregoing reasons, the Court denies the SEC's motion *in limine* number 7, grants in part and denies in part the SEC's motion *in limine* number 8, reserves final ruling on the SEC's motion *in limine* number 9, and grants in part and denies in part the SEC's motion *in limine* number 10.


Dated:  September 1, 2015                    _____
                                             Robert M. Dow, Jr.
                                             United States District Judge