**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND ) <br> EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MORANDO BERRETTINI and ) <br> RALPH J. PIRTLE, ) <br> ) <br> Defendants. ) | Case No. 10-cv-1614 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the motion [247] of Plaintiff the United States Securities and Exchange Commission ("SEC") for judgment and imposition of remedies. For the reasons stated below, the Court enters final judgment in favor of the SEC and against Defendants Morando Berrettini ("Berrettini") and Ralph J. Pirtle ("Pirtle") (collectively, "Defendants"). Berrettini and Pirtle are each required to pay, individually and not jointly and severally: (1) disgorgement in the amount of $120,311.00; (2) pre-judgment interest in the amount of $65,011.00; (3) and a civil penalty in the amount of $120,311.00. The total judgment against each Defendant is $305,633.00

**I.     Background[1]**

The SEC brought a complaint against Berrettini and Pirtle for engaging in deceptive practices in connection with the purchase and sale of securities in three publicly traded companies between December 2005 and June 2006. The governing complaint [5] alleges that Pirtle misappropriated inside information from his employer, Royal Philips, N.V. ("Philips"),

---

[1] A more complete background of this insider trading case, knowledge of which is assumed, is set forth in the Court's Opinion and Order [135] denying Defendants' motions for summary judgment. The Court provides a brief overview here.

and provided it to Berrettini with the intent to enable Berrettini to trade on the information. Pirtle was a member of Philips' due diligence team for three transactions in which Philips was acquiring or considering acquiring publicly traded companies that specialize in medical devices. The three companies were Lifeline Systems, Inc. ("Lifeline"), Invacare, Inc. ("Invacare"), and Intermagnetics Corporation ("Intermagnetics"). Philips ultimately acquired Lifeline and Intermagnetics. According to the complaint, Pirtle misappropriated Philips' inside information in violation of his obligations to Philips and "tipped" Berrettini about the proposed acquisitions of the three companies. Berrettini, a real estate broker, consultant, and preferred vendor for Philips, used the information from Pirtle to trade in the shares of Lifeline, Invacare, and Intermagnetics and made actual profits of $240,621. Also according to the complaint, between 2003 and January 2007, Berrettini made a series of payments to third parties on Pirtle's behalf, totaling more than $226,000, to pay for things like cars, trips to Las Vegas, and gambling. The complaint alleges that these payments were not "loans," as Pirtle contended, but instead were payments for business opportunities and inside information from Philips.

The SEC brought six claims against Defendants for violation of section 10(b) of the Exchange Act and Rule 10b-5 thereunder. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Counts One, Two and Three were brought against both Defendants based on the purchase and sale of securities in Lifeline, Invacare, and Intermagnetics, respectively. Counts Four, Five and Six were brought against Berrettini only and allege that he misappropriated and used for his own benefit Philips' material nonpublic information in connection with the purchase and sale of securities in Lifeline, Invacare, and Intermagnetics, respectively. The case was tried before a jury beginning on September 9, 2015 and concluding on September 24, 2015. Defendants' primary defense was that Pirtle simply provided information to Berrettini concerning the general

geographic areas in which Philips sought to make acquisitions so that Berrettini could perform market research, and Berrettini then independently researched publicly traded medical device companies in the area and bought the stock of Lifeline, Invacare, and Intermagnetics based on his research results and "hunches." Defendants also contended that the payments Berrettini made to third parties on Pirtle's behalf were simply loans, not payments for business opportunities or inside information. At the conclusion of trial, the jury found for the SEC and against Defendants on all counts.

The SEC now moves for final judgment and the imposition of remedies. The SEC seeks to permanently enjoin Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5. The SEC also seeks an order requiring Defendants to disgorge their ill-gotten gains and to pay prejudgment interest and civil penalties.

## II. Analysis

### A. Permanent Injunction

Once the SEC has demonstrated that a defendant has violated Section 10(b) or Rule 10b-5, "it 'need only show that there is a reasonable likelihood of future violations in order to obtain [injunctive] relief.'" *SEC v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015) (quoting *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)); see also 15 U.S.C. § 78u(d)(1). To assess the likelihood that a defendant will commit future violations, the Court assesses "'the totality of the circumstances surrounding the defendant and his violation.'" *Id.* (quoting *Holschuh*, 694 F.2d at 144). These circumstances may include (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation and degree of scienter; (3) the isolated or recurrent nature of the violation; (4) the likelihood that the defendant's customary business activities could involve him in future violations; (5) the defendant's recognition of his own culpability; and (6) the sincerity

of the defendant's assurances against future violations. *Id.* The Court "may determine that some of the factors are inapplicable in a particular case" and "take other relevant factors into account in deciding whether to impose the bar and, if so, its duration." *SEC v. Benger*, 64 F. Supp. 3d 1136, 1139 (N.D. Ill. 2014). However, a "defendant's past violation of the securities laws, without more, is insufficient to support permanent injunctive relief." *Id.* (citation omitted).

The SEC argues that the totality of circumstances warrant permanently enjoining both Defendants from committing future violations of Section 10(b) and Rule 10b-5. Pirtle does not object to the entry of a permanent injunction against him, but argues that the SEC improperly analyzes the circumstances surrounding his securities violations. Berrettini does not address whether a permanent injunction should be entered against him.

Taking into account the totality of circumstances surrounding Defendants' violations, the Court concludes that entry of a permanent injunction is warranted. First, considering the gravity of the harm, the SEC has presented evidence that Berrettini made a profit of $240,622 trading in Lifeline and Intermagnetics stock based on the inside information he obtained from Pirtle. Beyond the actual profits made in this case, "insider trading causes harm to the credibility of the public markets," *SEC v. Michel*, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007), by making would-be investors hesitant "to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law," *United States v. O'Hagan*, 521 U.S. 642, 658 (1997). This factor weighs in favor of injunctive relief.

Second, both Defendants participated in the securities violations and acted with scienter. "In the Seventh Circuit, both knowledge and recklessness satisfy the scienter requirement." *SEC v. Ferrone*, 163 F. Supp. 3d 549, 568 (N.D. Ill. 2016). In order to rule in the SEC's favor, the jury necessarily found that both Defendants acted either knowingly or recklessly. Specifically,

4

in order to rule in the SEC's favor, the jury necessarily found that Berrettini "bought or sold securities knowingly or recklessly on the basis of material non-public information provided to him by . . . Pirtle" and "knew or should have known that he received th[e] information as a result of a violation of fiduciary duty or other duty of confidentiality." [237] at 17-18 (jury instructions). The jury also necessarily found that Pirtle "knew or was reckless in not knowing that . . . Berrettini would buy or sell securities on the basis of information" that Pirtle provided. [237] at 17.

Pirtle argues that the because the jury may not have believed that his participation in the securities violations was "knowing," and that because he did not trade any securities or directly profit from Berrettini's trades, he should be held to a lesser degree of culpability than Berrettini. However, the Seventh Circuit recognizes that "'[d]eliberate ignorance . . . is a form of knowledge'" and that "honest 'white heart/empty head' good faith is inconsistent with a subjectively reckless state of mind." *Ferrone*, 163 F. Supp. 3d at 569 (quoting *SEC v. Jakubowski,* 150 F.3d 675, 681–82 (7th Cir. 1998)). Moreover, while Pirtle did not himself trade in Lifeline, Invacare, and Intermagnetics stock, he did owe a fiduciary duty to his employer, Philips. As the Supreme Court has explained, "[a] tippee trading on inside information will in many circumstances be guilty of fraud against individual shareholders, a violation for which the tipper shares responsibility. But the insider, in disclosing such information, also frequently breaches fiduciary duties toward the issuer itself." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985). The jury heard evidence that Philips trained Pirtle on insider training and the handling of confidential information, and that Pirtle disregarded this training. Further, Philips entrusted Pirtle with confidential information about its acquisition targets and Pirtle betrayed that trust by sharing the information with Berrettini, whether knowingly by

5

providing Berrettini with the names of the targets or recklessly by providing Berrettini with the general geographic area in which the targets were located. Moreover, Pirtle's brief fails to acknowledge the evidence presented at trial that Pirtle took more than $200,000 in undisclosed "loans" from Berrettini in violation of Philips' policies. Therefore, the Court concludes that this factor also weighs in favor of a permanent injunction.

Third, Defendant's violations of the securities laws were recurrent, rather than a one-time, isolated occurrence. Berrettini, acting on information provided by Pirtle, traded in the stock of three publicly held companies over a nine-month long period. This factor also weighs in favor of injunctive relief.

Fourth, it is not clear from the parties' briefs whether Defendants' customary business activities will or might present Defendants with opportunities to commit further violations of the securities laws. While Pirtle works for a large bank, Wells Fargo, as a lead negotiator, Pirtle represents to the Court that he is no longer involved in mergers and acquisitions and is mainly involved in negotiating leases. Still, it is not entirely clear to the Court whether Pirtle, in this role, might have access to material non-public information that could be used to his benefit to buy and sell securities. Berrettini represents that, as a result of the SEC's complaint against him, he has already lost his ability to work in the real estate investment and development fields. It is therefore unclear how Berrettini would gain access to material non-public information. Due to these uncertainties, this factor is neutral.

Fifth, Berrettini has not acknowledged his culpability for engaging in insider trading. Instead, Berrettini insists (and spends nearly all of his brief arguing) that the jury simply got it wrong. This factor weighs in favor of issuing a permanent injunction against Berrettini. As the Seventh Circuit has explained, "[t]he criminal who in the teeth of the evidence insists that he is

6

innocent, that indeed not the victims of his crime but he himself is the injured party, demonstrates by his obduracy the likelihood that he will repeat his crime, and this justifies the imposition of a harsher penalty on him," and "[i]t makes no difference whether, as in this case, the government is seeking only a civil remedy." *SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002); see also *Michel*, 521 F. Supp. 2d at 830 (permanent injunction against remote tippee for securities violations was warranted where, among other things, he "never admitted any wrongful behavior"); *SEC v. Koester*, 13 F. Supp. 3d 928, 934 (S.D. Ind. 2014) (permanent injunction against foreign currency trader for securities violations warranted where, among other things, he "show[ed] no culpability or remorse for his actions").

Pirtle argues that his decision to go to trial does not constitute a failure to acknowledge his culpability and asserts that his "'acceptance of the jury verdict without further appeal is sufficient acknowledgement of the wrongfulness of his conduct.'" [252] at 11 (quoting *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (affirming district court's decision not to enjoin defendant dentist from engaging in future securities violations, where violation was isolated and unsophisticated, defendant did not conceal his trades, defendant was unlikely to be in the position of receiving future inside information, and defendant did not appeal jury's verdict). The Court is not persuaded by its review of Seventh Circuit case law, however, that a decision not to appeal, by itself, constitutes an acknowledgment of culpability for a securities violation. See, e.g., *Michel*, 521 F. Supp. 2d at 530; *SEC v. Randy*, 38 F. Supp. 2d 657, 673 (N.D. Ill. 1999) (defendant who "depict[ed] himself as an unwitting participant" in co-defendant's scheme and "ignore[d] the abundance of evidence that he knew or, at the very least, should have known of the nature of the scheme," failed to acknowledge his culpability for securities violations). As Pirtle points out, however, he did not deny at trial that he provided Berrettini with information

7

about the geographic locations of Philips' acquisition targets or that he continued to provide Berrettini with such information even after realizing that Berrettini might be using it to trade in the target companies' stock. The Court acknowledges that Pirtle stands in a different posture than Berrettini in regard to acceptance of responsibility for his actions that the jury determined to be unlawful. But that factor does not outweigh the others discussed above in regard to the propriety of entering permanent injunctive relief under the totality of the circumstances present here. In short, while Pirtle has a better argument against a permanent injunction than Berrettini, it ultimately falls short of convincing the Court to enjoin one co-Defendant but not the other.

In sum, considering all six factors together, along with Defendants' decision not to object to imposition of injunctive relief, the Court concludes that Berrettini and Pirtle should both be permanently enjoined from committing future violations of Section 10(b) and Rule 10b-5.

### B. Disgorgement and Pre-Judgment Interest

The remedy of disgorgement is "designed both to deprive a wrongdoer of unjust enrichment" and to "deter others from violating the securities laws." *Michel*, 521 F. Supp. 2d at 830. It should be "fashioned so as to deprive" the defendant of the "unjust enrichment he derived from his securities violations," *SEC v. Koenig*, 532 F. Supp. 2d 987, 994 (N.D. Ill. 2007), but should not be used punitively, *Michel*, 521 F. Supp. 2d at 830. "The Court has broad discretion not only in determining whether to order disgorgement but also in calculating the amount to be disgorged." *Id.* Thus, "[t]he disgorgement figure calculation is discretionary and need not be exact." *Koenig*, 532 F. Supp. 2d at 994. "A showing of the actual profits on the tainted transactions presumptively satisfies the SEC's burden of approximating the disgorgement amount." *Michel*, 521 F. Supp. 2d at 831 (internal quotation marks and citation omitted); see also *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (affirming district court order fixing

disgorgement at difference between price at which defendants bought securities based on inside information and price of securities after disclosure of inside information, where "inside information permitted [the insider] to buy at $9 a security that would soon be worth $22").

The disgorgement award should also include "all gains flowing from the illegal conduct, including prejudgment interest, to ensure that the wrongdoer does not make any illicit profits." *Michel*, 521 F. Supp. 2d at 831. Factors that the Court may, but is not required to, consider in deciding if and how much prejudgment interest should be awarded include "whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 & n.2 (1989). Typically, the Court calculates pre-judgment interest in accordance with the delinquent tax rate established by the Internal Revenue Service, Internal Revenue Code § 6621(a)(2). See *Michel*, 521 F. Supp. 2d at 831; *Koenig*, 532 F. Supp. 2d at 995; *Randy,* 38 F. Supp. 2d at 674; *SEC v. Jakubowski,* 1997 WL 598108, at *2 (N.D. Ill. Sept. 19, 1997).

Where, as here, both the tipper and the tippee have been held liable for violating the securities laws, the Court has discretion to hold them jointly and severally liable for the disgorgement amount. See *SEC v. Pentagon Capital Mgt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013) (affirming district court's "decision to impose the disgorgement award jointly and severally on all defendants" because "there is no statutory requirement that a disgorgement award be measured as to each individual defendant"); *SEC v. Rooney*, 2014 WL 3500301, at *4 (N.D. Ill. July 14, 2014) ("Joint and several liability for disgorgement is proper when two or more persons cooperate with, and aid each other in the commission of illegal conduct. When

9

such cooperation is established the court can hold all such tortfeasors jointly and severally liable for the entire amount of damages caused by all, unless liability can be reasonably apportioned."); *SEC v. Anticevic*, 2010 WL 3239421, at *5 (S.D.N.Y. Aug. 16, 2010) ("In insider trading cases, the tipper may be held jointly and severally liable for the profits obtained by his tippees."); cf. *Michel*, 521 F. Supp. 2d at 831 (explaining that a "tipper can be required to disgorge his tippees' profits, even if the tippees themselves have not been found to have violated securities laws").

In this case, the SEC requests that Defendants be held jointly and severally liable for disgorgement in the amount of $240,622, which is the total amount that Berrettini profited by trading in Lifeline and Intermagnetics securities. See [248] at 18 (citing unrebutted testimony of SEC senior account Luz Aguilar).

Berrettini argues that the Court should deduct from this disgorgement amount the approximately $20,000 that he lost trading in Invacare stock. The Court disagrees that Berrettini's liability for ill-gotten gains should be lessened simply because one of the tips he acted on turned out not to be profitable. Berrettini was not entitled to any of the profits he made trading in Lifeline and Intermagnetics securities and reducing the damages amount due to his losses on Invacare would be inconsistent with the principle of unjust enrichment. The Court concludes that disgorgement of the full $240,622 in profits is proper.

The Court now turns to prejudgment interest. Pirtle argues that the Court should not require him to pay prejudgment interest on the $240,622 in profits because Pirtle did not make any trades himself and did not directly profit from Berrettini's improper trades. The Court is not convinced. "[T]he amount on which a violator must pay prejudgment interest usually tracks the amount that the party is ordered to disgorge." *SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir.

10

2014); see also *Randy*, 38 F. Supp. 2d at 674. "Whether or not a party personally enjoyed the gains from the illegal action does not alter this principle." *Contorinis*, 743 F.3d at 308.

Pirtle also argues that the Court should reduce the amount of prejudgment interest awarded due to the SEC's delays in bringing the case to trial. Pirtle points out that the SEC began its investigation in 2006, did not file its complaint until March 2010, and did not commence the trial under September 2015. Pirtle blames the delay solely on the SEC and its frequent changes in the attorneys handling this matter. Regardless of who is responsible for the delay, the Seventh Circuit has recognized that "[d]elay is a reason to award interest, not to avoid interest," because "the longer the case lasts, the more of the stakes the defendant keeps even if it loses (and the less the victorious plaintiff receives), unless interest is added." *Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997); see also *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (affirming district court's decision to order defendant to pay prejudgment interest for entire period from the time of defendants' unlawful gains to the entry of judgment, despite defendant's objection that the litigation was protracted through some fault of the SEC). In addition, many of the delays in this case were caused by the Defendants. See [49] (Berrettini motion for extension of time to file summary judgment reply); [76] (Pirtle oral motion to extend briefing schedule on dispositive motions); [82] (Pirtle motion to extend briefing schedule on dispositive motions); [156], [163], and [180] (Berrettini motions to continue trial date); [168] (Pirtle motion to continue trial). For these reasons, the Court will not reduce the interest award simply because the case took a significant amount of time to make it to trial. The Court will, however, accept the SEC's recommendation to award interest only through the end of February 2016, rather than through the present date. It is undisputed that this amount is $130,022. Therefore, the total disgorgement award is $370,644.

11

The Court must now determine whether the award should be joint and several or apportioned between the two Defendants. Pirtle argues that the award should be apportioned because Berrettini is unlikely to have the funds to pay half of the award, leaving Pirtle to shoulder most of the costs. Although the Court has discretion to make the disgorgement award joint and several, *Pentagon Capital Mgt.*, 725 F.3d at 288, in this case it will apportion the disgorgement amount (including pre-judgment interest) evenly between the two Defendants. Based on the record presented to the Court, it appears that the SEC might, but is not certain to, experience difficulty collecting the judgment from Berrettini, who claims to be contemplating filing for bankruptcy. Although Berrettini and the SEC argue about whether Berrettini still owns significant real estate holdings, the fact that Berrettini represented himself at trial with standby counsel suggests to the Court that Berrettini is experiencing, at a minimum, serious cash flow problems. Given that Berrettini is just as responsible as Pirtle for the securities violations, and that Berrettini was the one who profited directly from the illegal trades and continues to deny any culpability for his actions, the Court concludes that it would be inequitable to enter an order than may well have the effect of causing Pirtle to shoulder the entire disgorgement award. Therefore, Berrettini and Pirtle are each individually ordered to pay $120,311 in disgorgement and $65,011 in pre-judgment interest.

### C. Civil Penalties

In insider trading cases, the award of civil penalties is authorized by 15 U.S.C. § 78u-1(a)(1)(A). "The amount of the penalty which may be imposed on the person who committed such violation shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication." 15 U.S.C. § 78u-1(a)(2). In determining the penalty to impose, the

Court "may consider such factors as the need for deterrence; defendant's acceptance of responsibility; defendant's net worth; the flagrancy of his violation; and other sanctions already imposed for the same conduct." *Michel*, 2008 WL 51369, at *1. Multipliers of 1.5, 2, or even 3 times the amount of the ill-begotten gains can be imposed. See, *e.g.*, *Lipson,* 278 F.3d at 664–65 (affirming district court's decision to impose a maximum penalty on CEO who violated securities law, taking into consideration CEO's wealth ($100 million), the flagrancy of his violation, and his obduracy). The Court should award at least some penalty, because "imposing no civil penalty at all" would "impermissibly increase the incentive to violate the law by insider trading." *SEC v. Kirch*, 263 F. Supp. 2d 1144, 1152 (N.D. Ill. 2003). "After all, if an offender is not caught he or she gets away scot free with the improperly obtained profit—so it is obviously necessary to up the ante well beyond mere disgorgement when an offender is brought to task." *Id.*

The SEC does not request penalties in a particular amount but asks that the penalties awarded be meaningful to reflect Defendants' lack of contrition, the egregious nature of their insider trading, and their concealment and deception, and to send a signal to other would-be inside traders.

The Court will consider Berrettini's penalty first. Berrettini argues that no civil penalty should be imposed on him because he is innocent and has already been severely punished as a result of the SEC investigation effectively forcing him out of the real estate investment and development business since 2008. Berrettini also argues that he has not had "any meaningful true income since 2008," is "totally illiquid," has "lost his home in Lake Forest, Illinois which is now in foreclosure," has lost his family summer home and other "major real estate holdings," has been "forced to sell other property at a los[s] to general income in order to live," is "stalling a

13

major law suit that is expected to be filed against him for over $762,000 over a personal loan from the Private Bank and Trust Co.," and "is generally contemplating the filing for bankruptcy." [250] at 23-24.

The Court concludes that a civil penalty equal to the amount of the disgorgement amount owed by Berrettini, or $120,311.00, is appropriate under the facts of this case. In reaching this conclusion, the Court has considered: 1) the need for deterrence; 2) Berrettini's acceptance of responsibility; 3) the flagrancy of his violation; 4) any other sanctions that have already been imposed on him for the same conduct; and 5) his net worth. *Michel*, 2008 WL 51369, at *1.

A significant penalty is warranted to deter Berrettini and other would-be insider traders from misappropriating material, non-public information for their own gain. See *Sargent*, 329 F.3d at 42 n.2 (quoting H.R. Rep. No. 100–910, at 11 (1988)) ("'The creation of a new civil penalty was intended to go beyond disgorgement of illegal profits to add the imposition of a significant fine as a needed deterrent.'"); *SEC v. Gunn*, 2010 WL 3359465, at *9 (N.D. Tex. Aug. 25, 2010) ("Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if he is not detected, and requires only a return of ill-gotten gains if he is caught." (internal citation and quotation marks omitted)).

Further, Berrettini continues to deny any responsibility for his securities violations, and insists that he will never accept responsibility, because the unsophisticated jury simply got it wrong. His denial of any wrongdoing weighs in favor of imposing a substantial penalty. See *Lipson*, 278 F.3d at 664. Berrettini's violation of the securities laws was also flagrant. On the one hand, Berrettini insists that he did nothing wrong while, on the other hand, he admits that he used material non-public information from Pirtle—at a minimum, information about the geographic areas in which the companies Philips sought to acquire were located—in order to

14

make more than $200,000 trading in the targets' stocks. Berrettini then continued to trade on information from Pirtle, even after he was under investigation by the SEC.

The only sanction that the Court has imposed on Berrettini so far for his violation of the securities laws is a permanent injunction. This is hardly a severe penalty, as it simply requires Berrettini not to violate the securities laws, which he has no right to do in the first place. The Court does not consider the disgorgement and pre-judgment interest awards to be sanctions, because they merely take away Berrettini's ill-gotten gains. Berrettini also received a break on the disgorgement and pre-judgment interest awards, because Pirtle is required to pay half of the total disgorgement and pre-judgment interest amounts even though it was Berrettini who made and directly profited from the illegal trades.

Finally, the Court has no evidence of Berrettini's net worth other than his representation that he is contemplating filing for bankruptcy. Berrettini claims to be illiquid and to have been forced to sell some real estate holdings, but has not provided the Court with any evidence of the purported illiquid assets that he still holds. If, for instance, Berrettini still owns several million dollars in real estate and/or assets held in a trust, it would be entirely inappropriate to reduce his civil penalty based on his unsupported declaration of poverty. And if, as Berrettini maintains, he expects a $762,000 lawsuit to be filed against him and is contemplating bankruptcy, then the Court's decision to impose a $120,311 civil penalty in this case will make little difference to Berrettini's bottom line.

Considering the factors together, the Court concludes that a substantial penalty is warranted in this case, and Berrettini's incomplete presentation of his financial condition does not change this conclusion. See *Michel*, 2008 WL 516369, at *2-3 (imposing penalty of $416,821, equal to one-and-a-half times the amount of profits defendant was ordered to disgorge,

where defendant's violation was flagrant, defendant lacked contrition and never admitted responsibility for his actions, even though defendant had lost his job, was unable to practice his chosen profession, had no present income and numerous debts, and was the sole support for his family); see also *Lipson*, 278 F.3d at 664 (upholding the imposition of maximum civil penalty in an insider trading case, in part, because defendant "steadfastly maintained his innocence and claimed to be the victim of a government vendetta"); *SEC v. v. Rosenthal*, 426 Fed. Appx. 1, 2011 WL 2271743, at *2-3 (2d Cir. June 9, 2011) (district court did not abuse its discretion in finding that insider trading defendants' repeated and knowing violations of the securities laws warranted a civil penalty equal to two times the illegal profits generated from their securities violations, where the district court properly considered factors including the egregiousness of the defendants' conduct, the degree of the defendants' scienter, whether the defendants' conduct created substantial losses or the risk of substantial losses to other persons, whether the defendants' conduct was isolated or recurrent, and whether the penalty should be reduced due to the defendants' demonstrated current and future financial condition); *Drucker v. SEC*, 346 Fed. Appx. 663, 2009 WL 3004104, at *2 (2d Cir. Sept. 21, 2009) (district court did not abuse its discretion in imposing civil penalty upon corporate insider for securities violations that amounted to twice total disgorgement amount where penalty was "well within the statutory limitations and reasonable based on the record"); *SEC v. Suman*, 684 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (civil penalties of $2 million for acquiring company's employee and $1 million for his wife were warranted after they were found to have engaged in insider trading after gaining confidential information regarding merger, even though few Securities and Exchange Commission (SEC) resources were required to ferret out fraud, where employee and wife had realized $1 million

16

profit on basis of information, and penalties were necessary to deter reprehensible fraudulent conduct).

The Court now turns to Pirtle. The Court concludes that a civil penalty of $120,311.00, or an amount equal to the disgorgement amount, also should be imposed against Pirtle. In reaching this conclusion, the Court has considered, as it did with Berrettini: 1) the need for deterrence; 2) Pirtle's acceptance of responsibility; 3) the flagrancy of his violation; 4) any other sanctions that have already been imposed on him for the same conduct; and 5) his net worth. *Michel*, 2008 WL 51369, at *1.

Pirtle argues that a penalty is not necessary to deter him because he is no longer involved in mergers and acquisitions. However, Pirtle has not demonstrated that his current role as a real estate negotiator at Wells Fargo would never bring him into contact with information that could be used to commit securities violations. Moreover, even assuming that Pirtle will never again be in position to misuse confidential information for insider trading, there is still a general need to deter insiders from committing securities violations, which warrants the award of a substantial penalty.

To be sure, in contrast to Berrettini, Pirtle has accepted some responsibility for his actions. Nevertheless, Pirtle's conduct was flagrant and Berrettini could not have acted without Pirtle's information. In addition, while Pirtle may not have directly profited from Berrettini's trades, he received over $200,000 in purported "loans" from Berrettini, in violation of Philips' policies. Further, evidence was presented at trial that even after Pirtle learned that Berrettini was being investigated by the SEC for trading on Philips' material non-public information, Pirtle continued to pass on information to Berrettini about the "general geographic area" of companies

17

that Philips was considering acquiring. Taken as a whole, the Court has no difficulty concluding that Pirtle's actions were flagrant.

Finally, Pirtle has not provided any evidence of his net worth, so the Court cannot evaluate the full financial effect that a civil penalty would have on him. Although Pirtle claims that he may lose his job as a result of this litigation, the Court finds it unlikely that the size of the penalty—rather than the mere fact of the jury's determination of liability—would be the cause of any adverse employment action against Pirtle. As far as the record shows, Wells Fargo has not deemed it necessary to terminate Pirtle during the years-long SEC investigation or even after the jury found for the SEC on all counts. Considering the factors together, the Court concludes that a penalty equal to the full amount of Pirtle's disgorgement liability (not including pre-judgment interest) is fair and equitable. See *Michel*, 2008 WL 516369, at *2-3.

### III. Conclusion

For the foregoing reasons, the Court enters final judgment in favor of the SEC and against Defendants. Berrettini and Pirtle are each required to pay, individually and not jointly and severally: (1) disgorgement in the amount of $120,311.00; (2) pre-judgment interest in the amount of $65,011.00; (3) and a civil penalty in the amount of $120,311.00. The total judgment against each Defendant is $305,633.00.

Dated: November 2, 2016

Robert M. Dow, Jr.
United States District Judge

18